IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MICHAEL MCGRATH,

       Plaintiff,

vs.                                       No. CIV 14-0504 JB/SCY

CITY OF ALBUQUERQUE;
CITY PERSONNEL BOARD;
RICHARD BERRY, Mayor;
ROBERT PERRY, Chief Administrative
Officer; BRUCE RIZZIERI, Transit Dept.
Director; and PAULA FORNEY, Attorney,

       Defendants.

**<u>MEMORANDUM OPINION</u>**[1]

**THIS MATTER** comes before the Court on the Opposed Motion to Dismiss, or, in the alternative, Motion for Summary Judgment by the City of Albuquerque, Richard J. Berry, Robbery Perry and Bruce Rizzieri and Memorandum in Support, filed June 18, 2014 (Doc. 17)("Motion"). The Court held a hearing on March 17, 2015. The primary issues are: (i) whether collateral estoppel bars McGrath's due process and equal protection claims against the City of Albuquerque, Richard Berry, Robert Perry, and Bruce Rizzieri (collectively, the "City Management Defendants"); (ii) whether the Court should grant summary judgment in favor of the City Management Defendants on McGrath's due process and equal protection claims; (iii) whether McGrath asserts a plausible claim under the Fourth Amendment of the Constitution

---

[1]On March 18, 2015, the Court entered an order granting the Opposed Motion to Dismiss, or, in the alternative, Motion for Summary Judgment by the City of Albuquerque, Richard J. Berry, Robbery Perry and Bruce Rizzieri and Memorandum in Support, filed June 18, 2014 (Doc. 17). <u>See</u> Order, filed March 18, 2015 (Doc. 35)("Order"). The Order stated that the Court would "at a later date issue a memorandum opinion more fully detailing its rationale for this decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion.

of the United States that Berry, Perry, and Rizzieri unlawfully searched him through the City of Albuquerque's random suspicionless drug-testing program for municipal bus drivers or whether McGrath has provided any evidence to support his Fourth Amendment claim; (iv) whether McGrath has shown that the City of Albuquerque has a policy or custom that directly caused its employees to violate McGrath's constitutional rights; and (v) whether the Court should remand McGrath's remaining state-law claims to the Second Judicial District Court, County of Bernalillo, State of New Mexico.  First, the Court cannot determine whether collateral estoppel bars McGrath's due process and equal protection claims.  Second, Count 1 of the Complaint for Violation of Statutory and Constitutional Rights, filed in state court January 9, 2014, filed in federal court May 27, 2014 (Doc. 1-1)("Complaint") -- which contains McGrath's due process and equal protection claims -- does not state a plausible claim, and McGrath has presented no evidence to support his allegations.  Third, Count 3 does not state a plausible Fourth Amendment unlawful search claim against Rizzieri, Berry, and Perry, and no evidence supports McGrath's allegations.  Fourth, McGrath has not shown that the City of Albuquerque had a policy or custom that directly caused its employees to violate McGrath's constitutional rights.  Fifth, the Court will remand McGrath's remaining state-law claims against the City Management Defendants. The Court will grant the Motion in part and deny it in part.  The Court will dismiss with prejudice McGrath's federal claims against the City Management Defendants, and remand McGrath's state-law claims to the Second Judicial District Court.

## **FACTUAL BACKGROUND**

This case is about an alleged unlawful termination.  The Court will first outline the Complaint's allegations.  Next, the Court will provide the undisputed facts from the Motion.

1.      **The Complaint's Allegations.**

The Court will set forth the Complaint's allegations in four parts.  First, the Court will explain the parties to this action.  Second, the Court will describe the City of Albuquerque Transit Department's disciplinary action against McGrath.  Third, the Court will detail the City of Albuquerque's Appeal of the Hearing Officer's decision to reinstate McGrath's employment.  Fourth, and finally, the Court will explain the City of Albuquerque's Merit System.

a.      **The Parties.**

McGrath is a resident of Albuquerque, New Mexico, and the City of Albuquerque Transit Department employed him as a bus driver.  See Complaint ¶ 1, at 1.  Perry is the City of Albuquerque's Chief Administrative Officer and "primary policy-maker."  Complaint ¶ 2, at 1.  Rizzieri is the Director of the Transit Department.  See Complaint ¶ 2, at 1.  Forney is a former Assistant City Attorney "who now contracts with the City to represent the City and City officials."  Complaint ¶ 3, at 1.  The Personnel Board "is supposed to consist of five members, two selected by the Mayor and two by a vote of City employees, who select a neutral chairperson," but the "current [Personnel] Board is missing one of its employee members and only has four members."  Complaint ¶ 4, at 2.

b.      **The Transit Department's Disciplinary Action Against McGrath.**

McGrath was a full-time classified[2] bus driver for the City of Albuquerque when the Defendants terminated his employment "under the City's zero-tolerance drug testing policy [(the 'Substance Abuse Policy')] on February 25, 2008."  Complaint ¶ 7, at 2.  McGrath appealed his

---

[2]The Supreme Court of New Mexico has defined a "classified employee" as "one who is permanently employed by the City [of Albuquerque] and entitled to all rights and benefits guaranteed by the merit system, one of which is recourse to the grievance procedure."  Lovato v. City of Albuquerque, 1987-NMSC-086, ¶ 2, 742 P.2d 499.

termination, and on September 26, 2008, City of Albuquerque Personnel Hearing Officer Patrick Bingham "heard testimony."   Complaint ¶ 8, at 2.   Mr. Bingham recommended upholding McGrath's termination for just cause, because McGrath violated the Substance Abuse Policy. See Complaint ¶ 8, at 2.   Because of concerns about the City of Albuquerque's "failure to negotiate"[3] the Policy, however, the Personnel Board remanded the case to Mr. Bingham "for determination of whether the City and its Unions had reached impasse prior to the imposition by the City of the revised 2006 [Substance Abuse Policy]."   Complaint ¶ 9, at 2 (internal quotation marks omitted).   "The Hearing Officer subsequently did nothing and the Personnel Board took no action."   Complaint ¶ 9, at 2.

"The City Labor Board[4] . . . had previously concluded that[,] when the City attempted to re-implement its zero-tolerance penalty the parties were not at [an] impasse, but that the City had negotiated over drug testing penalties in good faith."   Complaint ¶ 10, at 3 (internal quotation marks omitted).   "NMTU[5] appealed the good faith conclusion to the State district court."   Complaint ¶ 10, at 3.   In November, 2009, the Honorable Valerie A. Huling, District Judge, Second Judicial District, County of Bernalillo, State of New Mexico, "reversed the Labor Board, finding the City . . . neither negotiated in good faith nor to the point of impasse."   Complaint ¶ 11, at 3 (citation omitted)(internal quotation marks omitted).   Judge Huling thus

---

[3]The Complaint does not explain how or why the City of Albuquerque failed to negotiate the Policy.

[4]It is unclear, but it appears that the Complaint is referring to the Labor Management Relations Board for the City of Albuquerque.   See Labor Management Relations Board, City of Albuquerque,   https://www.cabq.gov/clerk/administrative-hearings/labor-management-relations-board (last visited July 31, 2015).

[5]The Complaint does not define "NMTU," but it likely stands for the New Mexico Transportation Union.   See NMTU Home Page, New Mexico Transportation Union, http://www.nmtu.net/ (last visited July 31, 2015)(referring to the New Mexico Transportation Union as the "NMTU").

remanded the matter to the Labor Board "to make appropriate findings and conclusions and to provide appropriate relief."   Complaint ¶ 11, at 3 (citation omitted)(internal quotation marks omitted).

In December, 2009, "the [Mayor] Berry Administration disbanded the Labor Board and there were no more meetings of the Labor Board until June, 2011."   Complaint ¶ 12, at 3. McGrath's termination case was still pending before Bingham when Forney, Perry, "Ennen,"[6] and Rizzieri generated a "Notice of Reinstatement" and a new "Pre-determination Hearing Notice."   Complaint ¶ 13, at 3 (internal quotation marks omitted).   The Pre-determination Hearing Notice re-charged McGrath with his 2008 drug-testing violation and added the following charges:

> Ms. Forney and M[r]. Rizzieri additionally accused McGrath of violations of Rule 301.1 (Duty to the Public); 301.2 (Professional Excellence); 301.3 (Standards of Conduct); 301.8 (Safety); 311 (Alcohol/Drug Possession and Consumption); and 902.1 (Reasons for Disciplinary Actions) (C)(Incompetence, inefficiency or inadequate performance of duties); (G)(Misconduct); (K)(Violation of Substance Abuse Policy); and (M)(Other disciplinary reasons): (1)(Call into question employees ability to perform assigned duties or job functions); (2)(harm public respect) and (3)(impair the operation or efficiency of any City department).

Complaint ¶ 14, at 3 n.1.

On August 6, 2010, Rizzieri approved new findings, "including the false contention that McGrath was impaired while driving a City of Albuquerque bus."   Complaint ¶ 15, at 4 (internal quotation marks omitted)(emphases omitted).   Although McGrath "had not been returned to work, was represented by counsel, and was challenging his termination," Forney, Perry, and Rizzieri again terminated McGrath for the his 2008 drug-testing violation.   Complaint ¶ 16, at 4 (internal quotation marks omitted).   When Rizzieri terminated McGrath's employment a second

---

[6]The Complaint does not provide Ennen's first name, does not name him as a defendant, and does not provide any other information about him.

time, Rizzieri knew "that the positive test result had been more than two years before and that McGrath had been fired then."  Complaint ¶ 17, at 4.  Rizzieri did not consider the length of time that had passed since McGrath's 2008 failed drug test in making his termination decision, because "a positive test is a positive test[,]" and because he thought that it would "set a bad precedent that anyone could test positive for cocaine, have a less than exemplar[y] record, and still keep [his] position as a bus driver."  Complaint ¶ 17, at 4 (internal quotation marks omitted).

On February 8, 2011, the City of Albuquerque issued a "Supplement to Substance Abuse Policy" ("Supplement") to clarify the Substance Abuse Policy.  Complaint ¶ 18, at 4.  The Supplement explained that "[t]he Second Judicial district court invalidated the discipline provisions of the 2006 Substance Abuse Policy" and clarified that, until a new Substance Abuse Policy is enacted, the City of Albuquerque would "apply the 2006 policy but will apply the discipline procedures in the 1999 policy."[7]  Complaint ¶ 18, at 4 (internal quotation marks omitted).

Mr. Bingham held another hearing on McGrath's termination, "and this time recommended reinstatement to City employment with back pay and benefits."  Complaint ¶ 19, at 4.  The Personnel Board accepted Mr. Bingham's recommendation, but modified it to provide that the City of Albuquerque would "reinstate McGrath to a non-safety sensitive position."  Complaint ¶ 19, at 4 (internal quotation marks omitted).

c.      **The City of Albuquerque's Appeal.**

On July 28, 2011, Forney appealed the Personnel Board's decision to the Second Judicial District Court, and on September 30, 2011, she filed the "City's Statement of Appellate Issues."  Complaint ¶ 20, at 5.  On November 21, 2011, Forney removed the appeal to the United States

---

[7]The Complaint does not explain the discipline procedures in the 1999 Substance Abuse Policy.

District Court for the District of New Mexico, contending that, "for the first time in the City's appeal, McGrath alleged that his constitutional rights were violated, that the City violated his right to due process and that the City's actions in terminating McGrath were oppressive and unfair."  Complaint ¶ 21, at 5.  Forney argued that McGrath could have brought a claim that his "due process and constitutional rights were allegedly violated in either state or federal court"; alternatively, he "could have asserted a claim under 28 U.S.C. Sec. 1983 asking for reinstatement."  Complaint ¶ 22, at 5 (internal quotation marks omitted).  "Instead," Forney asserted, he "elected to raise his constitutional claims before the state district court in responding to the City's Statement of Appellate Issues."  Complaint ¶ 22, at 5 (internal quotation marks omitted).  The United States District Court for the District of New Mexico held that Forney's removal of the case to federal court "was without an objective basis," and "remanded the case to the State district court and awarded sanctions against Ms. Forney."[8]  Complaint ¶ 24, at 5.

The Personnel Board "did nothing to enforce its reinstatement Order and did not oppose the City's appeal of the Personnel Board's decision to reinstate McGrath."  Complaint ¶ 25, at 5 (internal quotation marks omitted).  While the case was still in federal court, Forney filed a "Notice of Supplemental Authority" that "consist[ed] of a ruling by Judge Beatrice Brickhouse, a State district judge, on the case of Reginald Adolph, another City bus driver."  Complaint ¶ 26, at 6.  Neither Forney nor Judge Brickhouse disclosed that, "before she became a district judge, Beatrice Brickhouse was an Assistant City Attorney and co-counsel with Paula Forney on the City's drug testing cases."  Complaint ¶ 27, at 6.

---

[8]The Complaint does not identify which United States District Judge in the District of New Mexico made this ruling, but the case's docket sheet on CM/ECF states that the case was assigned to the Honorable Judith C. Herrera.

On February 1, 2012, Forney, "Mr. Yermal,"[9] and Perry reinstated "the old zero-tolerance [drug testing] penalty, again ignoring and deliberately violating the requirement that drug testing penalties must be negotiated with the unions."  Complaint ¶ 28, at 6.  Although the City of Albuquerque's administrative appeal "had been fully briefed by December, 2011," the Honorable Alan M. Malott, District Judge, Second Judicial District, County of Bernalillo, State of New Mexico, "refused to act on the case and in May, 2013, . . set a September, 2013, Scheduling Conference."  Complaint ¶ 29, at 6 (internal quotation marks omitted).  The day after the Scheduling Conference, Judge Malott recused himself.  See Complaint ¶ 29, at 6.  Forney then filed a motion to stay her appeal of the Personnel Board's reinstatement order, "as she again arranged for the reinstatement and termination of McGrath's employment for the third time."  Complaint ¶ 30, at 6.  "Although McGrath is still represented by counsel, Ms. Forney and the City Defendants have now purportedly terminated McGrath's employment for the third time, this time for his failure to appear in response to Ms. Forney's orders."  Complaint ¶ 31, at 6.

### d.     The City of Albuquerque's Merit System.

The Charter of the City of Albuquerque "requires the City to maintain an active Personnel Board under a Merit System of personnel management."  Complaint ¶ 32, at 6.  The Merit System is intended to provide a means to resolve disputes and disciplinary matters at the lowest level and with the least expense possible.  See Complaint ¶ 32, at 7.  The Charter provides that the Mayor "'shall . . . .  (c) Be responsible for the administration and protection of the merit system; . . . [and] (d) With the advice and consent of the Council, hire or appoint the City Attorney, an officer to administer the merit system, and all other senior administrative or cabinet level officers . . . .'"  Complaint ¶ 34, at 7 (alterations in Complaint but not in quoted

---

[9]The Complaint does not provide Mr. Yermal's first name or any other information about him.

source)(emphasis in Complaint but not in quoted source)(quoting Charter). The Defendants have not hired or appointed an officer to administer the merit system, as the Charter requires. <u>See</u> Complaint ¶ 35, at 7. To the contrary, "in its Merit System Ordinance (MSO) the Mayor erroneously 'designates the Chief Administrative Officer (CAO) of the city to be responsible for the administration of the merit system.'" Complaint ¶ 36, at 7 (quoting MSO, § 3-1-1). Consequently, "in the absence of supervision, oversight, and a fair and neutral hearing process, City officials and City attorneys are administering and controlling the Personnel Board and its Hearing Officers in a manner that is biased, unfair, and contrary" to McGrath's and other City of Albuquerque employees' rights. Complaint ¶ 37, at 7.

## 2.   <u>The Undisputed Facts.</u>[10]

"February 25, 2008, McGrath was terminated from his position with the City's Transit Department for testing positive for cocaine in a random drug test." Motion ¶ 1, at 12 (setting forth this fact). <u>See</u> Affidavit of Mary Scott (dated June 18, 2014) ¶ 6, at 2, filed June 18, 2014 (Doc. 17-1)("Scott Aff."). "Subsequent to his termination, McGrath appealed his termination pursuant to the City's Merit System Ordinance, ROA § 3-1-1 et seq., as case number PB-08-09." Motion ¶ 1a, at 12 (setting forth this fact). <u>See</u> Scott Aff. ¶ 6a, at 2. "During the pendency of this proceeding, the unions challenged the City's 2006 'zero tolerance' disciplinary provision for

---

[10]McGrath did not respond to the Motion and has not otherwise disputed any of the Motion's facts. The local rules state:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b). Because McGrath did not dispute any of the Motion's facts, and all of the Motion's facts have evidentiary support, the Court will deem them all undisputed.

substance abuse in an appeal of a City Labor Board proceeding." Motion ¶ 1b, at 12 (setting forth this fact). See Scott Aff. ¶ 6b, at 2. "A state district court judge, the Honorable Valerie Huling presiding, ruled that the City had not properly bargained the disciplinary provision of the 2006 policy and invalidated the disciplinary provisions for 'zero tolerance.'" Motion ¶ 1c, at 12 (setting forth this fact). See Scott Aff. ¶ 6c, at 2. "The City reinstated McGrath (and several other employees terminated under the 2006 'zero tolerance' provisions), and, applying the previous 1999 substance abuse policy's disciplinary provisions (which policy contained a 'second chance provision' for some employees), issued notices for new pre-determination hearings to address appropriate discipline under the 1999 policy." Motion ¶ 1d, at 12 (setting forth this fact). See Scott Aff. ¶ 6d, at 2.

"In McGrath's situation, additional allegations were added to the new pre-determination notice." Motion ¶ 2, at 12 (setting forth this fact). See Scott Aff. ¶ 7, at 2. "McGrath was subsequently terminated, again, and he again appealed that termination, Personnel Board cause PB-10-14." Motion ¶ 2, at 12 (setting forth this fact). See Scott Aff. ¶ 7, at 2. "Because McGrath's 2008 appeal was pending, the two matters, PB-08-09 and PB-10-14, were consolidated by the hearing officer." Motion ¶ 1b, at 12 (setting forth this fact). See Scott Aff. ¶ 7, at 2; Recommendation of Patrick Bingham, Personnel Board Hearing Officer (undated), filed June 18, 2014 (Doc. 17-2)("Recommendation"). "[On] July 13, 2011, the Board adopted the findings of the hearing officer regarding McGrath's positive drug test but modified his discipline to 20-day suspension and reinstatement him to a different, non-safety sensitive position." Motion ¶ 2a, at 12 (setting forth this fact). See Scott Aff. ¶ 7a, at 2; Personnel Board Order (dated July 13, 2011), filed June 18, 2014 (Doc. 17-3)("Personnel Board Order"). "The City appealed the Personnel Board's ruling on the general basis that the Personnel Board did not have

the jurisdiction to order an employee be placed in a different position from which he had been terminated." Motion ¶ 2b, at 13 (setting forth this fact).  See Scott Aff. ¶ 7b, at 3.

> While McGrath's administrative appeal of the two personnel board proceeding was pending, the Court of Appeals ruled in Adolph vs. The City of Albuquerque, 2013 WL 5309901 (2013), cert den., that the Personnel Board did have jurisdiction to reinstate an employee to a different job based on the language of its enabling legislation.

Motion ¶ 3, at 13 (setting forth this fact).  See Scott Aff. ¶ 8, at 3.  "The City dismissed its appeal of Personnel Board ruling in the McGrath case and took steps to reinstate Mr. McGrath." Motion ¶ 4, at 13 (setting forth this fact).  See Scott Aff. ¶ 8, at 3.

"To effect the reinstatement, Mary Scott sent or caused to be sent a letter to Mr. McGrath and his attorney Mr. Livingston directing Mr. McGrath to report for work."  Motion ¶ 5, at 13 (setting forth this fact).  See Scott Aff. ¶ 9, at 3; Letter from Mary Scott, Deputy Director of Human Resources for the City of Albuquerque to Paul McGrath (dated Oct. 31, 2013), filed June 18, 2014 (Doc. 17-4)("Oct. 31, 2013, Ltr.").  "Mr. McGrath did not report as directed; neither he nor his attorney responded to the correspondence."  Motion ¶ 6, at 13 (setting forth this fact). See Scott Aff. ¶ 10, at 3.  "Consequently, Mary Scott sent or caused to be sent a notice of a pre-determination or Loudermill hearing[11] to Mr. McGrath and his attorney regarding the failure to

---

[11]In Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985)("Loudermill"), the Supreme Court of the United States held that

> the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.  This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate.  We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the

report."  Motion ¶ 6, at 13 (setting forth this fact).  See Scott Aff. ¶ 10, at 3; Letter from Mary Scott to Michael McGrath (dated Nov. 26, 2013), filed June 18, 2014 (Doc. 17-5)("Nov. 26, 2013, Ltr.").  "Neither Mr. McGrath nor his attorney responded in any form."  Motion ¶ 6, at 13 (setting forth this fact).  See Scott Aff. ¶ 10, at 3.  "As a result of Mr. McGrath's failure to report to work after reinstatement and failure to provide any explanation or justification for the failure to report, Bruce Rizzieri, the Director of the Transit Department, terminated Mr. McGrath's employment."  Motion ¶ 7, at 14 (setting forth this fact).  See Scott Aff. ¶ 11, at 4; Notification of Final Action -- Failure to Report Termination from Employment with the City of Albuquerque (dated Dec. 13, 2013), filed June 18, 2014 (Doc. 17-6).  "Neither Mr. McGrath nor his attorney filed a timely appeal of the termination pursuant to the City's Merit System Ordinance and attendant procedural rules."  Motion ¶ 7, at 14 (setting forth this fact).  See Scott Aff. ¶ 11, at 4.

## PROCEDURAL BACKGROUND

McGrath filed suit in state court on January 9, 2014, see Complaint at 1, and the Defendants removed the case to federal court on May 27, 2014, see Notice of Removal, filed May 27, 2014 (Doc. 1).  McGrath asserts six causes of action: (i) due process and equal protection, see Complaint ¶¶ 41-49, at 6 (Count I); (ii) breach of contract and duty of good faith, see Complaint ¶¶ 50-53, at 9-10 (Count II); (iii) a Fourth Amendment unlawful search, see Complaint ¶¶ 54-59, at 10-11 (Count III); (iv) wrongful prosecution and defamation, see Complaint ¶¶ 60-64, at 11 (Count IV); (v) professional misconduct, see Complaint ¶¶ 65-72, at

---

subsequent proceedings.  In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

470 U.S. at 542 (footnote omitted)(citations omitted)(internal quotation marks omitted). Accordingly, a hearing that an employer holds before discharging an employee who has a constitutionally protected property interest in his employment is often called a Loudermill hearing.

12-13 (Count V); and (vi) prohibited labor practices, see Complaint ¶¶ 73-77, at 13.  McGrath asks for: (i) declaratory and compensatory relief for all of his claims; (ii) reinstatement; (iii) calculation and payment of back pay, benefits, and actual damages "so as to make Plaintiff whole"; (iv) injunctive relief, nominal damages, punitive damages, costs and reasonable attorney's fees; and (v) "such other and further relief as the Court deems just."  Complaint ¶¶ A-D, at 14.

## 1. **The Motion.**

The City Management Defendants filed the Motion on June 18, 2014.  See Motion at 1. In the Motion, the City Management Defendants ask the Court to dismiss all of McGrath's claims against them with prejudice under rule 12(b)(6) of the Federal Rules of Civil Procedure, or, in the alternative, grant summary judgment in their favor under rule 56 of the Federal Rules of Civil Procedure.   See Motion at 1.   The City Management Defendants advance eight arguments regarding the motion to dismiss.   First, they contend that collateral estoppel bars McGrath's due-process and equal-protection claims, because the events surrounding his 2008 termination "were the subject of previous legal proceedings" in McGrath v. City of Albuquerque, in the Second Judicial District Court.  Motion at 2.  The City Management Defendants explain:

> McGrath v. City of Albuquerque, originated in City of Albuquerque Personnel Board appeals, PB-08-09 and PB-10-14 as an appeal of McGrath's termination of his employment pursuant to the City's Merit System Ordinance, ROA §3-1-1 et seq.; upon the City's appeal to the New Mexico Second Judicial District Court number was assigned CV-2011-0752; upon the City's removal to the federal district court of New Mexico was assigned CIV-11-1030 JCH/KBM; then remanded back to the Second Judicial District Court upon McGrath's motion to remand which the Second Judicial Court has since remanded the case to the City's Personnel Board.

Motion at 2 n.1.  The City Management Defendants argue that "McGrath is precluded from re-litigating the facts surrounding his previous termination, regardless of whether he raised all legal

theories in the first litigation." Motion at 2 (citing Strickland v. City of Albuquerque, 130 F.3d 1408, 1411 (10th Cir. 1997). Second, the City Management Defendants assert that the Complaint "do[es] not support an allegation that the City breached any contract owed to McGrath or any duty of good faith owed to him." Motion at 3.

Third, the City Management Defendants argue that McGrath has failed to state a claim for a Fourth Amendment violation, because "drug testing in the work place, particularly for an employee in a safety sensitive position, as plaintiff was here, is appropriate and acceptable." Motion at 3 (citing Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602 (1989); Rutherford v. City of Albuquerque, 77 F.3d 1258, 1260 (10th Cir. 1996); Saavedra v. City of Albuquerque, 73 F.3d 1525, 1531-32 (10th Cir. 1996)). Fourth, the City Management Defendants argue that qualified immunity precludes McGrath's § 1983 claims, because he has not shown that the City Management Defendants violated any of his clearly established rights. See Motion at 4-8. Fifth, the City Management Defendants maintain that McGrath's wrongful prosecution and defamation claims cannot go forward, because he previously litigated those claims and "no finding of falsity was made." Motion at 3. Sixth, the City Management Defendants assert that the Court does not have jurisdiction over McGrath's professional misconduct claims against Forney, Perry, and Randall, because they are all licensed to practice law in New Mexico, and any allegations of misconduct against attorneys fall under the purview of the Supreme Court of New Mexico and its Disciplinary Board. See Motion at 4 (citing Rule 17-102, N.M.R.A.).

Seventh, the City Management Defendants argue that the Court does not have jurisdiction over McGrath's prohibited labor practices claim, because the City of Albuquerque's Labor Management Relations Ordinance gives jurisdiction of those claims to the City's Labor Management Relations Board. See Motion at 4. Eighth, and finally, the City Management

Defendants contend that the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-1 through -30, precludes McGrath's state-law claims against them, because they were acting within the course and scope of their duties as government officials.  See Motion at 8.

As for their summary judgment argument, the City Management Defendants contend that

[t]his current complaint fails due to McGrath's failure to exhaust applicable administrative remedies; his unclean hands; his failure to mitigate his damages; his only actions and negligence contributing to his alleged injuries; laches and other limitations on this action; sovereign immunity; his failure to state a legal or equitable claim for relief, his lack of standing; the lack of breach of any contract by the City Management Defendant; the lack of breach of any fiduciary duty by the City Management Defendants; the lack of any breach of; the lack of detriment or damage suffered by Plaintiff as result of the City's actions; the lack of any violation of official policy constituting a constitutional tort; the lack of any affirmative link between the conduct of the City Management Defendants and the alleged injuries suffered by Plaintiff; the City's legitimate business purposes in its actions and its lawful, in good faith, proper exercise of governmental functions; and as a governmental entity, the City is not subject to suit under 42 U.S.C. § 1983; and, at all times relevant, City Management Defendants acted equally with regard to all similarly situated individuals; and the individual City Management Defendants are entitled to qualified immunity because their acts do not violate any clearly established constitutional rights of which they should have been aware.

Motion at 14.

## 2.    **The Hearing.**

The Court held a hearing on the Motion March 17, 2015.  See Transcript of Hearing (taken March 17, 2015)("Tr.").[12]  The hearing was short, largely because neither McGrath nor his attorney made an appearance.  The Court noted that its Courtroom Deputy, K'Aun Wild, sent a notice of the hearing to McGrath's last known address and that no mail had been returned as undeliverable.  See Tr. at 2:17-3:9 (Court).  The Court said that it had no reason to believe that McGrath has not received all of the necessary materials for his case.  See Tr. at 3:8-11 (Court).

---

[12]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

When the Court and the parties took up the Motion, the City Management Defendants reiterated the arguments from their briefing and agreed with the Court that it could resolve the Motion solely based on rule 12(b)(6).  See Tr. at 20:13-16 (Court, Hults).  The Court said that it was inclined to grant the Motion, but that it would have to determine whether to use rule 12(b)(6) or rule 56.  See Tr. at 24:16-25:5 (Court).

### LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff."  (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other

motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint. See 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure: Civil § 1277 (3d ed. 2014). If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6). See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.). The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion. Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense). It appears, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific

or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, No. CIV 08-0140 W, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this practice, the Court has permitted it, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1235-36 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING SUMMARY JUDGMENT UNDER RULE 56

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)[13] (emphasis in original). Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

---

[13]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law. See 10A Wright & Miller, supra, § 2727, at 470 ("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

1.      **The Genuine-Dispute Standard.**

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).   It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.   See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'"  (citation omitted)).   Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).   "In responding to a motion for summary judgment, 'a party cannot rest on

ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.   "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

    2.    **General Analytical Principles.**

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court

must "bear in mind the actual quantum and quality of proof necessary to support liability."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable

inferences and doubts in favor of the nonmoving party, and construe all evidence in the light

most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999);

Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."); McCleary v. Nat'l Cold

Storage, Inc., 67 F. Supp. 2d 1288, 1293 (D. Kan. 1999)(Crow, J.)("[A] summary judgment

motion does not empower a court to act as the jury and determine witness credibility, weigh the

evidence, or choose between competing inferences."  (citation omitted)).  Fourth, the court

cannot grant summary judgment when it is necessary to weigh the credibility of the witnesses

involved.[14]  See Fogarty v. Gallegos, 523 F.3d 1147, 1165 (10th Cir. 2008)("On summary

---

[14]A district court may not grant summary judgment on the grounds that the nonmovant's witnesses or affiants lack credibility, i.e., that what they say has a reduced presumption of truth, either because of their character for untruthfulness generally or because they are biased in the case at hand.  A district court may, however, deny summary judgment because the movant's affiants or witnesses do or may lack credibility.

Doubts as to the credibility of the movant's affiants or witnesses may lead the court to conclude that a genuine issue exists.  Indeed, as the Advisory Committee states in its Note to the 1963 amendment of Rule 56(e): "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."

. . . .

Clearly, if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial, inasmuch as this situation presents the type of dispute over a genuine issue of material fact that should be left to the trier of fact.  Thus, for example, if conflicting testimony appears in affidavits and depositions that are filed, summary judgment may be inappropriate as the issues involved will depend on the credibility of the witnesses.

_____

. . . .

A similar problem involving credibility arises when the knowledge of the events or occurrences on which the action is based lies exclusively within the control of the party moving for summary judgment. This situation occurs most commonly in actions in which the main issue involves the movant's state of mind, such as in fraud or defamation cases. Courts have been reluctant to deprive the nonmoving party of the opportunity of testing the credibility of the movant or the movant's witnesses in open court in this context. As explained by one commentator, "there is a justifiable judicial fear of the injustice which could result from judgment based on affidavits asserting facts that are, because of their nature, incapable of being effectively controverted."

In keeping with this attitude, if the moving party fails to make a full disclosure of the facts, the court may refuse to grant summary judgment even though the opponent merely denies the facts on information and belief. However, if all the evidence appears to have been disclosed, ostensibly the movant's credibility is less in doubt and the court, in deciding whether to grant the motion, simply may consider the opposing party's lack of knowledge as a factor, which, when weighed with all the other circumstances in the case, may preclude summary judgment.

10A Wright & Miller, supra, § 2726 (footnotes omitted).

The only formal exception to the rule against granting summary judgment on credibility grounds is the sham-affidavit rule. See infra Law Regarding Summary Judgment Under Rule 56, Part 4. Of course, most cases in which summary judgment is appropriate nonetheless rely, in some sense, on the credibility of the movant's witnesses or affiants. In an intestacy case, for example, the district court accepts the coroner's word that the decedent is in fact dead; this "credibility determination" is entirely appropriate and should prevail unless the nonmovant presents evidence -- not merely argument or representations of counsel -- calling it into question.

The best way to conceptualize the rule against weighing credibility is as a corollary of the master summary-judgment standard: if the evidence presented to the district court at the summary-judgment stage -- no more, no less -- were presented to the jury at trial, and all reasonable inferences -- including inferences about credibility -- were drawn in the nonmovant's favor, and if a directed verdict would be appropriate under these circumstances, then the court is justified in granting summary judgment. The range of "reasonable inferences" about the evidence is broader with witness credibility than it is with documentary or physical evidence, because, with witness testimony, important aspects of the evidence -- such as the witness' demeanor and extemporaneous behavior -- are unseen to the court at the summary-judgment phase, thus giving rise to a wider array of potential inferences.

The weighing of all manner of evidence -- not just witness credibility -- is a core jury function and not a judge's function in a jury trial. The reason that witness credibility is so often singled out as being an evidence-weighing exercise of which judges should be particularly wary is that, unlike with documentary or forensic evidence, live testimony is intrinsically different --

judgment, a district court may not weigh the credibility of the witnesses."); Eagle v. La. & S. Life Ins. Co., 464 F.2d 607, 608 (10th Cir. 1972)("Summary judgment is not proper when an issue turns on credibility.").

### 3.    Summary Judgment in the Qualified-Immunity Context.

In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. R. Civ. P. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 538 (1986)(footnote omitted).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

_____

and better -- than the cold records the judge reviews at the summary-judgment stage.  Put differently, a judge is just as equipped to factfind at the summary-judgment stage as he or she is at trial as it relates to documentary or physical evidence; it is the precepts underlying the separation of the judge's and jury's duties, rooted in the Seventh Amendment to the Constitution of the United States, that give rise to the general rule against weighing evidence at the summary-judgment stage.  With testimony, on the other hand, even putting foundational judge-jury divisions of labor aside, the judge is less equipped to factfind at the summary-judgment stage -- where all he or she has is a cold record -- than at trial.  It is for this reason that judges are not permitted to weigh evidence at the summary-judgment stage even when the case is set for a bench trial, rather than a jury trial.  See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999)(en banc)("In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.").

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]"  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott [v. Harris], 550 U.S. at 380).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  In Rhoads v. Miller, 352 F. App'x 289 (10th Cir.

2009)(unpublished)(Tymkovich, J.),[15] the Tenth Circuit "explained that the blatant contradictions

---

[15]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Tadlock v. Lahood, 550 F. App'x 541 (10th Cir. 2013)(unpublished), Douglass v. United Auto Workers Local Union 31, 188 F. App'x 656 (10th Cir. 2006) (unpublished), Chavez v. Perry, 142 F. App'x 325 (10th Cir. 2005), United States v. Reed, 195 F. App'x 815 (10th Cir. 2006)(unpublished), Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011)(unpublished), Lee v. Regents of Univ. of Cal., 221 F. App'x 711 (10th Cir. 2007)(unpublished), and Muller v. Culbertson, 408 F. App'x 194 (10th Cir. 2011)(unpublished), all have persuasive value with respect to material issues and will assist the Court in its preparation of this MO.

of the record must be supported by more than other witnesses' testimony[.]"   Lymon v. Aramark

Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury."   Scott v. Harris, 550 U.S. 372, 377 (2007).   "[T]his usually means adopting . . . the plaintiff's version of the facts," 550 U.S. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," 550 U.S. at 380.   In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.   550 U.S. at 379.   Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.   There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.   And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . .   Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation.   If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).   See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court" before

inquiring into whether there are genuine issues of material fact for resolution by the jury.   584

F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir.

1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are

irrelevant to the qualified immunity analysis because that analysis assumes the validity of the

plaintiffs' facts").

4.      **The Sham-Affidavit Rule.**

The Tenth Circuit has stated that "[t]here is authority for the proposition that in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements." Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)(citing 10B Wright & Miller, supra, § 2738, at 473-74; 6 James Wm. Moore, Moore's Federal Practice ¶ 56.22[1], at 56-1325 to 56-1326 (1985 ed.)).   There are situations, however, where courts "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." Franks v. Nimmo, 796 F.2d at 1237 (citing Foster v. Arcata Assocs., Inc., 772 F.2d 1453, 1462 (9th Cir. 1985); Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir. 1984); Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657-58 (11th Cir. 1984); Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1364 (8th Cir. 1983); Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).   The policy underlying these decisions is the "conclusion that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." Franks v. Nimmo, 796 F.2d at 1237 (citation omitted).

> To determine whether a contradicting affidavit seeks to create a sham fact issue, [the Tenth Circuit] ha[s] looked to three factors: whether: "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain."

Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 973 (10th Cir. 2001)(quoting Rios v. Bigler, 67 F.3d 1543, 1551 (10th Cir. 1995)).   In Ralston v. Smith & Nephew Richards, Inc., the Tenth Circuit found that the district court did not abuse its discretion in excluding later contradictory declarations in rendering its summary judgment ruling.   See 275 F.3d at 973.   The

Tenth Circuit noted that there was no question that the declarant was cross-examined in his deposition, "that he had access to the pertinent evidence at the time of his deposition," and "that there was nothing in the earlier deposition testimony reflecting any level of confusion or uncertainty concerning" the declarant's testimony "requiring clarification or explanation." 275 F.3d at 973.

**5.     Deferring Summary Judgment.**

Rule 56(d) provides:

**(d)     When Facts Are Unavailable to the Nonmovant.**

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

**(1)**     defer considering the motion or deny it;

**(2)**     allow time to obtain affidavits or declarations or to take discovery; or

**(3)**     issue any other appropriate order.

Fed. R. Civ. P. 56(d).  Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)."  Fed. R. Civ. P. 56(d) advisory committee committee's notes to the 2010 amendments.  "A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary judgment motion."  Fed. R. Civ. P. 56(d) advisory committee committee's notes to the 2010 amendments. The rule permits a nonmovant to show by affidavit or declaration the need for additional discovery; a formal affidavit is thus not required.  See Fed. R. Civ. P. 56(d).  The rule permits a "written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit."  Fed. R. Civ. P. 56(c) advisory committee committee's notes to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993).  "Unless dilatory or lacking in merit," a party's 56[(d)] application "should be liberally treated."  Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554 (citations omitted)(internal quotation marks).  "The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to opposition."  Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000).  Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete.  See Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition . . . ."  Lewis v. Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990).  To invoke rule 56(d), the party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  A party opposing summary judgment may not invoke rule 56(d) based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Moreover, while the summary-judgment movant's exclusive control of information weighs heavily in favor of relief under 56(d), see Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783, merely asserting such is insufficient to justify denial of summary judgment, see Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Furthermore, "if the party filing the Rule 56[(d)] affidavit has been dilatory, or the information sought is either irrelevant to the summary judgment motion or merely cumulative, no extension will be granted."  Jensen v. Redevelopment Agency of Sandy

City, 998 F.2d at 1554 (denying a rule 56(d) request and stating that "the record reflect[ed] that plaintiffs were dilatory in pursuing discovery prior to the filing of their 56[(d)] affidavit"). See Johnson v. Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M. 2004)(Browning, J.)(denying a 56(d) request where plaintiff did not explain why, during the discovery period that the court allowed, he did not obtain the discovery sought in his motion). The Tenth Circuit has summarized rule 56(d)'s requirements as follows:

> A prerequisite to granting relief pursuant to Rule 56[(d)] is an affidavit furnished by the nonmovant. Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented. This includes identifying the probable facts not available and what steps have been taken to obtain these facts. In this circuit, the nonmovant also must explain[, with specificity,] how additional time will enable him to rebut movant's allegations of no genuine issue of fact.

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (internal quotations and citations omitted). See Tadlock v. Lahood, 550 F. App'x 541, 547 (10th Cir. 2013)(unpublished)(citing Price ex rel. Price v. W. Res., Inc. for rule 56(d)'s requirements after the 2010 amendment; Douglass v. United Auto Workers Local Union 31, 188 F. App'x 656, 658 (10th Cir. 2006)(unpublished) (stating that the affidavit must state how the additional time would enable the party to meet its burden "with specificity"). A rule 56(d) affidavit or declaration must state, with specificity, what additional discovery is believed necessary. See Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006); Chavez v. Perry, 142 F. App'x 325, 334 (10th Cir. 2005) (unpublished)("To resist summary judgment on this basis (56[(d)]), a party must specifically identify what facts it seeks to discover and show how those facts would materially aid its case on the dispositive issues."). If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery. See Tadlock v. Lahood, 550 F. App'x at 547.

## LAW REGARDING FAILURE TO RESPOND TO A MOTION

"Failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion."  D.N.M.LR-Civ. 7.1(b).  The court cannot, however, grant a motion to dismiss or a motion for summary judgment based solely on the plaintiff's failure to respond and must consider the merits of the motion.  See Issa v. Comp USA, 354 F.3d 1174, 1177-78 (10th Cir. 2003)("[E]ven if a plaintiff does not file a response to a motion to dismiss for failure to state a claim, the district court must still examine the allegations in the plaintiff's complaint and determine whether the plaintiff has stated a claim upon which relief can be granted."); Reed v. Bennett, 312 F.3d 1190, 1194-95 (10th Cir. 2002)(holding that a district court cannot grant an unopposed motion for summary judgment unless the moving party has first met its burden of production and demonstrates it is legally entitled to judgment under rule 56).  The requirement that a court consider the merits before granting an unopposed motion to dismiss is "consistent with the purpose of rule 12(b)(6) motions as the purpose of such motions is to test 'the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.'"  Issa v. Comp USA, 354 F.3d at 1177-78 (quoting Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)).  Similarly, when a party fails to respond to a motion for summary judgment, a district court can properly grant the motion only "if the motion demonstrates no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."  Reed v. Bennett, 312 F.3d at 1196.  Failure to respond does "not relieve the court of its duty to make the specific determination required by Fed. R. Civ. P. 56(c)."  Reed v. Bennett, 312 F.3d at 1196.  Accordingly, although the local rules provide that a party's failure to respond to a motion for summary judgment is deemed consent to the Court granting the motion, the Court will nonetheless rule on motions for summary judgment on the

merits, and generally does not grant dispositive motions on procedural defaults alone.  See D.N.M.LR-Civ. 7.1(b) ("The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion."); Sawyer v. USAA Ins. Co., No. CIV 11-0523 JB/CG, 2012 WL 6005766, at *23 (D.N.M. Nov. 9, 2012)(Browning, J.)("It is important that Sawyer filed no written response to BCBSKC's motions and, under the rules, is deemed to have consented to the Court granting the motion. . . . The Court nonetheless carefully considered the merits of this motion and held a hearing, at which Sawyer presented no evidence.").

## RELEVANT LAW REGARDING RES JUDICATA AND ISSUE PRECLUSION

"Under res judicata . . . a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in the prior action." Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d 501, 503-04 (10th Cir. 2002). The general rule is that "[t]he appealability of a judgment . . . does not hinder its preclusive effect."  MACTEC, Inc. v. Gorelick, 427 F.3d 821, 832 (10th Cir. 2005)(citing 18A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4433, at 78-85 (2d ed. 2002)).  Accord Leo v. Garmin Intern., Inc., 464 F. App'x 737, 740 (10th Cir. 2012)("[I]t does not matter that [the plaintiff's] first appeal had not been resolved at the time [he] filed his second suit because under the federal law of claim preclusion, the district court's order was final for res judicata purposes.").  Courts occasionally refer to the two different effects of judgments under the doctrine of res judicata with various and sometimes conflicting terminology.  See 18 C. Wright, A. Miller & E. Cooper, supra, § 4402, at 7 ("The effects of former adjudication have been discussed and determined in varying and occasionally conflicting terminology.").  "[T]he broad 'res judicata' phrase refers to the distinctive effects of a judgment separately characterized

as 'claim preclusion' and 'issue preclusion.'"   18 C. Wright, A. Miller & E. Cooper, <u>supra</u>,

§ 4402, at 7.  The United States Court of Appeals for the Fifth Circuit has presented a summary

that explains the two doctrines:

> The rules of res judicata, as the term is sometimes sweepingly used, actually comprise two doctrines concerning the preclusive effect of a prior adjudication.  The first such doctrine is "claim preclusion," or true res judicata. It treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same "claim" or "cause of action." <u>Sea-Land Services, Inc. v. Gaudet</u>, 1974, 414 U.S. 573, 578-79 . . . .  When the plaintiff obtains a judgment in his favor, his claim "merges" in the judgment; he may seek no further relief on that claim in a separate action. Conversely, when a judgment is rendered for a defendant, the plaintiff's claim is extinguished; the judgment then acts as a "bar." <u>Angel v. Bullington</u>, 1947, 330 U.S. 183 . . . .  <u>Cf.</u> <u>Cleckner v. Republic Van and Storage Co.</u>, 5 Cir. 1977, 556 F.2d 766. . . .  Under these rules of claim preclusion, the effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial.  <u>Garner v. Giarrusso</u>, 5 Cir. 1978, 571 F.2d 1330 (1978); <u>International Assoc. of Machinists & Aerospace Workers v. Nix</u>, 5 Cir. 1975, 512 F.2d 125, 131; <u>Blanchard v. St. Paul Fire and Marine Ins. Co.</u>, 5 Cir. 1965, 341 F.2d 351, 359. . . .  The aim of claim preclusion is thus to avoid multiple suits on identical entitlements or obligations between the same parties, accompanied, as they would be, by the redetermination of identical issues of duty and breach.
>
> The second doctrine, collateral estoppel or "issue preclusion," recognizes that suits addressed to particular claims may present issues relevant to suits on other claims.   In order to effectuate the public policy in favor of minimizing redundant litigation, issue preclusion bars the relitigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties.  <u>Harris v. Washington</u>, 1971, 404 U.S. 55 . . . .  It is insufficient for the invocation of issue preclusion that some question of fact or law in a later suit was relevant to a prior adjudication between the parties; the contested issue must have been litigated and necessary to the judgment earlier rendered.

<u>Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.</u>, 575 F.2d 530, 535-36 (5th Cir. 1978).

"The doctrine of res judicata, or claim preclusion, 'bars a second suit involving the same

parties or their privies based on the same cause of action.'"  <u>Roybal v. City of Albuquerque</u>, No.

CIV.08-0181 JB/LFG, 2009 WL 1300048, at *5 (D.N.M. Feb. 2, 2009)(Browning, J.)(quoting

<u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326 n.5 (1979)).  "Under Tenth Circuit law, claim

preclusion applies when three elements exist: (1) a final judgment on the merits in an earlier action; (2) identity of the parties in the two suits; and (3) identity of the cause of action in both suits."   MACTEC, Inc. v. Gorelick, 427 F.3d at 831.   The Tenth Circuit has adopted the Restatement (Second) of Judgments § 24's "transactional" approach to determine what constitutes a "cause of action" for claim preclusion.   Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d at 504.   Under this approach, a cause of action includes "all claims or legal theories of recovery that arise from the same transaction, event, or occurrence."   Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d at 504 (quoting Nwosun v. Gen. Mills Rest., Inc., 124 F.3d 1255, 1257 (10th Cir. 1997)).   Claim preclusion does not, however, "extend from criminal prosecutions to civil actions."   18B C. Wright, A. Miller & E. Cooper, supra, § 4474, at 420.

Where the causes of action are not identical, the second aspect of the doctrine of res judicata, termed "collateral estoppel" or "issue preclusion," may still preclude parties from relitigating issues in a second, not identical cause of action, where the particular issues were litigated in a prior case.   See In re Corey, 583 F.3d 1249, 1251 (10th Cir. 2009)("The doctrine of issue preclusion prevents a party that has lost the battle over an issue in one lawsuit from relitigating the same issue in another lawsuit.").   The Tenth Circuit has stated: "Under federal law, issue preclusion attaches only when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." In re Corey, 583 F.3d at 1251 (quoting Arizona v. California, 530 U.S. 392, 414 (2000); Restatement (Second) of Judgments § 27 cmt. e.)(internal quotations and alterations omitted). See Restatement (Second) of Judgments § 27 ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment,

the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.").  The Tenth Circuit's test for issue preclusion under res judicata consists of four elements:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been fully adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1093 (10th Cir. 2003)(quoting United States v. Botefuhr, 309 F.3d 1263, 1282 (10th Cir. 2002)).

"It is well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding."  Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568 (1951).  See Considine v. United States, 683 F.2d 1285, 1286 (9th Cir. 1982)("A prior conviction will estop a party from contesting in a later civil suit any element necessarily established in the criminal trial.").  The Tenth Circuit has stated that whether a defendant is estopped from relitigating an issue after a criminal trial "is whether the question was 'distinctly put in issue and directly determined' in the criminal prosecution."  Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d 313, 316 (10th Cir. 1970)(quoting Emich Motors Corp. v. General Motors Corp., 340 U.S. at 569).  Thus, "[i]n the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment."  Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d at 316 (quoting Emich Motors Corp. v. General Motors Corp., 340 U.S. at 569)(internal quotations omitted).  "With respect to issues determined in a criminal prosecution: (1) A judgment in favor of the prosecuting authority is preclusive in favor of the government: (a) In a

subsequent civil action between the government and the defendant in the criminal prosecution, as stated in § 27 with the exceptions stated in § 28." Restatement (Second) of Judgments § 85.

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)). The Supreme Court has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject

only to a few specifically established and well-delineated exceptions." Katz v. United States,

389 U.S. 347, 357 (1967)(footnotes omitted).

### 1.   **United States v. Jones.**

The defendant in United States v. Jones was suspected of drug trafficking, and a joint

Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task

force obtained a warrant authorizing installation in Washington, D.C., within ten days, of a

Global Positioning System device to the defendant's car. See 132 S. Ct. at 948.  On the eleventh

day, task force agents attached the GPS device to the bottom of the defendant's car while the car

was in Maryland.  The agents then used the GPS device to track the defendant's movements over

the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of

data sent from the device. See 132 S. Ct. at 948.

The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the

majority, in which Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor joined,

held that "the Government's installation of a GPS device on a target's vehicle, and its use of that

device to monitor the vehicle's movements, constitutes a 'search.'" 132 S. Ct. at 949.  Justice

Scalia reasoned that the United States' conduct was a Fourth Amendment search, because the

government trespassed on a constitutionally protected area. See 132 S. Ct. at 949 ("The Fourth

Amendment provides . . . that '[t]he right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures, shall not be violated.'  It is

beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment.").  Such a

physical intrusion, Justice Scalia opined, would have come within the Framers' intended

definition of a "search": "It is important to be clear about what occurred in this case: The

Government physically occupied private property for the purpose of obtaining information.  We

have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." 132 S. Ct. at 949. Justice Scalia reconciled the Supreme Court's conclusion that attaching a GPS device to track a Jeep in plain view was a Fourth Amendment search with New York v. Class, 475 U.S. 106 (1986), in which the Supreme Court concluded that a visual examination of the outside of a vehicle while in plain view does not constitute a search, by noting that "[i]n Class itself we suggested that this [physical invasion] would make a difference, for we concluded that an officer's momentary reaching into the interior of a vehicle did constitute a search." 132 S. Ct. at 952.

Justice Scalia reasoned that the Fourth Amendment's text supports taking a property law based approach to determine whether there is a search, but did not shy away from the fact that, in recent history, the Supreme Court had deviated from this approach:

> The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; the phrase "in their persons, houses, papers, and effects" would have been superfluous.
>
> Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. Kyllo v. United States, 533 U.S. [at] 31 . . . . Our later cases, of course, have deviated from that exclusively property-based approach. . . . [and] have applied the analysis of Justice Harlan's concurrence in [Katz v. United States], which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," id., at 464 . . . .

132 S. Ct. at 949-50.

The United States had contended that, under the "Harlan standard" -- i.e., the Katz v. United States reasonable-expectation-of-privacy approach -- "no search occurred here, since Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the Government agents (its underbody) and in the locations of the Jeep on the public roads, which were visible to all." 132 S. Ct. at 950. Justice Scalia concluded, however, that the Supreme

Court "need not address the Government's contentions" in relation to the Katz v. United States

reasonable-expectation-of-privacy test analysis, because the trespass-based search approach,

which existed at the time of the Fourth Amendment's adoption, disposed of the issue:

> Jones's Fourth Amendment rights do not rise or fall with the Katz formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." Kyllo[ v. United States, 533 U.S. at 34]. As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates. Katz did not repudiate that understanding. Less than two years later the Court upheld defendants' contention that the Government could not introduce against them conversations between other people obtained by warrantless placement of electronic surveillance devices in their homes. The opinion rejected the dissent's contention that there was no Fourth Amendment violation "unless the conversational privacy of the homeowner himself is invaded." Alderman v. United States, 394 U.S. 165, 176 . . . (1969). "[W]e [do not] believe that Katz, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home . . . ." Id., at 180.

132 S. Ct. at 950-51 (some alteration in original)(footnotes omitted).

In her concurrence, Justice Sotomayor agreed that "the trespassory test applied in the

majority's opinion reflects an irreducible constitutional minimum: When the Government

physically invades personal property to gather information, a search occurs. The reaffirmation of

that principle suffices to decide this case." 132 S. Ct. at 955 (Sotomayor, J., concurring). She

continued:

> Of course, the Fourth Amendment is not concerned only with trespassory intrusions on property. See, e.g., Kyllo v. United States, 533 U.S. [at] 31-33 . . . . Rather, even in the absence of a trespass, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." Id., at 33; see also Smith v. Maryland, 442 U.S. 735, 740-741 . . . (1979); Katz v. United States, 389 U.S. [at] 361 . . . (Harlan, J., concurring).

132 S. Ct. at 954-55 (Sotomayor, J., concurring). Justice Sotomayor's concurrence focused on

the reality, in her view, that,

> physical intrusion is now unnecessary to many forms of surveillance. . . .   In cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property, the majority opinion's trespassory test may provide little guidance. But "[s]ituations involving merely the transmission of electronic signals without trespass would remain subject to <u>Katz</u> analysis."

132 S. Ct. at 955 (Sotomayor, J., concurring)(alteration in original)(quoting the majority opinion,

132 S. Ct. at 953).

Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, concurred in the judgment

only, reasoning that, although he agreed with the result, given the use of twenty-first century

technology, he would have analyzed whether the government's long-term monitoring of the

defendant violated the <u>Katz v. United States</u> reasonable-expectation-of-privacy test:

> This case requires us to apply the Fourth Amendment's prohibition of unreasonable searches and seizures to a 21st-century surveillance technique, the use of a Global Positioning System (GPS) device to monitor a vehicle's movements for an extended period of time.  Ironically, the Court has chosen to decide this case based on 18th-century tort law.  By attaching a small GPS device to the underside of the vehicle that respondent drove, the law enforcement officers in this case engaged in conduct that might have provided grounds in 1791 for a suit for trespass to chattels.   And for this reason, the Court concludes, the installation and use of the GPS device constituted a search.  [132 S. Ct.] at 948-949.
>
> This holding, in my judgment, is unwise.  It strains the language of the Fourth Amendment; it has little if any support in current Fourth Amendment case law; and it is highly artificial.
>
> I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove.

132 S. Ct. at 957-58 (Alito, J., concurring in the judgment).  Justice Alito first took issue with

what he called the majority's "questionable proposition that the[] two procedures [of attaching

and using a GPS device] cannot be separated for Fourth amendment purposes."  132 S. Ct. at

958.  Justice Alito submitted that, "[i]f these two procedures are analyzed separately, it is not at

all clear from the Court's opinion why either should be regarded as a search."  132 S. Ct. at 958.

Justice Alito contended that the majority's opinion suggests that "the concept of a search, as originally understood, comprehended any technical trespass that led to the gathering of evidence," but disagreed with the majority, stating: "[W]e know this is incorrect."  132 S. Ct at 958.  Justice Alito pointed out that the open-fields doctrine grew out of the distinction between a physical intrusion of any private property and property that is part of a home: "At common law, any unauthorized intrusion on private property was actionable, but a trespass on open fields . . . does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a 'hous[e]' within the meaning of the Fourth Amendment."  132 S. Ct. at 958-959 (Alito, J., concurring in the judgment)(quoting Oliver v. United States, 466 U.S. 170 (1984)).

Justice Alito asserted that the trespass-based approach that the majority used was "repeatedly criticized" and ultimately "repudiated," based largely on its incompatibility with cases involving wiretapping and eavesdropping surveillance.  United States v. Jones, 132 S. Ct. at 959, 960 (Alito, J., concurring in the judgment).  Justice Alito contended that "the majority is hard pressed to find support in post-Katz cases for its trespass-based" decision that, when the United States attached the GPS device to Jones' Jeep, it trespassed on his effects and performed a Fourth Amendment search.  132 S. Ct. at 960-61.  Justice Alito pointed to multiple problems that he believes the majority's trespass-based approach creates.  First, he asserted that the majority's analysis is irreconcilable with the element of the United States' conduct that he contends society would find offensive -- the GPS-monitoring and not the attachment of the device.  If the United States could follow a car without physically trespassing on a person, home, paper, or effect, such as remotely monitoring a car via an internal GPS device, this monitoring would not constitute a Fourth Amendment search under the majority's analysis.  See 132 S. Ct.

at 961.  Second, along the same lines, Justice Alito pointed out an "incongruous result[]" from the majority's opinion that a short-term tracking of a vehicle with a GPS device, merely tracking a vehicle down a single street, is a Fourth Amendment search, while, "if the police follow the same car for a much longer period using unmarked cars and aerial assistance, this tracking is not subject to any Fourth Amendment constraints."  132 S. Ct. at 961.  Justice Alito also asserted that, by tying Fourth Amendment searches to property law and trespass concepts, the Fourth Amendment's protections "may vary from State to State," based on different property and contract laws in the various states.  132 S. Ct. at 961-62.

### 2.      **Florida v. Jardines**.

In Florida v. Jardines, 133 S. Ct. 1409 (2013), Justice Scalia, writing for the majority once again, held that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search.  133 S. Ct. at 1417-18.  Justices Thomas, Ginsburg, Sotomayor, and Kagan joined Justice Scalia's majority opinion in Florida v. Jardines. The Honorable Elena Kagan, Associate Justice, filed a separate concurring opinion, in which Justices Ginsburg and Sotomayor joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full."  133 S. Ct. at 1420 (Kagan, J., concurring).  Justice Alito dissented, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer joined his opinion.

In Florida v. Jardines, based on a tip that the defendant, Jardines, was growing marijuana in his home, the Miami-Dade, Florida, police department and the Drug Enforcement Administration sent a surveillance team to Jardines' home.  See 133 S. Ct. at 1413.  Observing nothing of note in the first fifteen minutes watching the home, two detectives approached the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs

by alerting the detectives with behavioral changes.  See 133 S. Ct. at 1413.  As the dog approached Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point."  133 S. Ct. at 1413.  The dog's handler then immediately left the porch, and told the other agents and officers at the scene that there had been a positive alert for drugs, at which time the officers applied for and received a search warrant for the residence, the execution of which revealed marijuana plants.  See 133 S. Ct. at 1413.  Jardines was arrested for trafficking in marijuana and moved to suppress the evidence based on an illegal search.  See 133 S. Ct. at 1413.

Justice Scalia held that the use of a drug-sniffing dog was a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

133 S. Ct. at 1414.  Justice Scalia noted that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." 133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text." 133 S. Ct. at 1414.

Justice Scalia held that "the officers' investigation took place in a constitutionally protected area," the home, as the front porch is the home's curtilage.  See 133 S. Ct. at 1414-15.

Justice Scalia then "turn[ed] to the question of whether it was accomplished through an unlicensed physical intrusion," 133 S. Ct. at 1415, and reasoned that it was:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. Ciraolo, 476 U.S. 207, 213 (1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner." Id. Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." 2 Wils. K.B., at 291. As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so. He had not.

133 S. Ct. at 1415. Justice Scalia noted that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," he concluded that "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that." 133 S. Ct. at 1415-16 (emphasis in original). Justice Scalia explained:

> An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the police. The scope of a license -- express or implied -- is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

133 S. Ct. at 1416.

The State of Florida argued "that investigation by a forensic narcotics dog by definition cannot implicate any legitimate privacy interest."  133 S. Ct. at 1417.  The State of Florida cited to United States v. Place, 462 U.S. 696 (1983), United States v. Jacobsen, 466 U.S. 109 (1984), and Illinois v. Caballes, 543 U.S. 405 (2005), "which held, respectively, that canine inspection of luggage in an airport, chemical testing of a substance that had fallen from a parcel in transit, and canine inspection of an automobile during a lawful traffic stop, do not violate the 'reasonable expectation of privacy' described in Katz."  133 S. Ct. at 1417.  Justice Scalia pointed out that, in United States v. Jones, the Supreme Court had already concluded that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under Katz v. United States] when the government gains evidence by physically intruding on constitutionally protected areas."  133 S. Ct. at 1417 (quoting United States v. Jones, 132 S. Ct. at 951-52).  Because the Supreme Court had already concluded that the conduct was a Fourth Amendment search under the trespass-based analysis, therefore, it held that it was unnecessary to consider whether the conduct amounts to a search under the Katz v. United States reasonable-expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz.  One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy.  That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

133 S. Ct. at 1417.

Justice Kagan wrote a concurring opinion, noting: "The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests."  133 S. Ct. at 1418 (Kagan, J., concurring).  Justice Kagan

analogized the government's conduct in using a drug sniffing dog on Jardines' porch to a stranger coming to the front door, who "doesn't knock or say hello," but instead, peers through the windows "into your home's furthest corners" with "super-high-powered binoculars," and "in just a couple of minutes, his uncommon behavior allows him to learn details of your life you disclose to no one."  133 S. Ct. at 1418 (Kagan, J., concurring).  This conduct, she posited, is a trespass which exceeds any implied license and is also an invasion of reasonable expectations of privacy; she argued that, like her analogy, the facts in Florida v. Jardines likewise involved a trespass and a violation of privacy expectations:

> That case is this case in every way that matters.  Here, police officers came to Joelis Jardines' door with a super-sensitive instrument, which they deployed to detect things inside that they could not perceive unassisted.  The equipment they used was animal, not mineral.  But contra the dissent, see [133 S. Ct.] at 1420 (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is of no significance in determining whether a search occurred.

133 S. Ct. at 1418 (Kagan, J., concurring).  According to Justice Kagan, had she written the majority opinion based on the Katz v. United States reasonable-expectations-of-privacy search test,

> [a] decision along those lines would have looked . . . well, much like this one.  It would have talked about "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  [133 S. Ct.] at 1414 (quoting Silverman v. United States, 365 U.S. 505, 511 . . . (1961)).  It would have insisted on maintaining the "practical value" of that right by preventing police officers from standing in an adjacent space and "trawl[ing] for evidence with impunity."  [133 S. Ct.] at 1414.  It would have explained that "'privacy expectations are most heightened'" in the home and the surrounding area.  [133 S. Ct.] at 1414-15 (quoting California v. Ciraolo, 476 U.S. [at] 213 . . . ).  And it would have determined that police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there.  See [133 S. Ct.] at 1415-16, and n. 2-3.

133 S. Ct. 1409, 1418-19 (Kagan, J., concurring).

Justice Alito's dissenting opinion, in which Chief Justice Roberts, and Justices Kennedy and Breyer, joined, submitted that "[t]he Court's decision in this important Fourth Amendment case is based on a putative rule of trespass law that is nowhere to be found in the annals of Anglo-American jurisprudence." 133 S. Ct. at 1420 (Alito, J., dissenting). Justice Alito noted that general trespass law permits a license to public members to use a walkway to approach a house's door, including strangers such as mailmen and solicitors, and the majority's conclusion that "the police officer in this case, Detective Bartelt, committed a trespass because he was accompanied during his otherwise lawful visit to the front door of respondent's house by his dog, Franky," is without a sound basis in trespass law. 133 S. Ct. at 1420-21 (Alito, J., dissenting). Justice Alito also asserted that decision is inconsistent with the Katz v. United States' reasonable-expectations-of-privacy test: "A reasonable person understands that odors emanating from a house may be detected from locations that are open to the public, and a reasonable person will not count on the strength of those odors remaining within the range that, while detectible by a dog, cannot be smelled by a human." Florida v. Jardines, 133 S. Ct. at 1421 (Alito, J., dissenting).

Justice Alito contended that the majority's opinion that the detective "exceeded the boundaries of the license to approach the house that is recognized by the law of trespass, . . . is unfounded." 133 S. Ct. at 1421 (Alito, J., dissenting). Justice Alito pointed out that the law of trespass does not distinguish between visitors or reasons for the visit in granting an implied license to approach a house's front door. See 133 S. Ct. at 1421-22 (Alito, J., dissenting). He also asserted: "As I understand the law of trespass and the scope of the implied license, a visitor who adheres to these limitations is not necessarily required to ring the doorbell, knock on the door, or attempt to speak with an occupant," and uses mail carriers as an example of such a

visitor.  133 S. Ct. at 1423 (Alito, J., dissenting).  Justice Alito pointed out that the implied

license also applies to law enforcement and cited to Kentucky v. King, 131 S. Ct. 1849 (2011), in

which the Supreme Court held that law enforcement officers approaching the front door of a

residence to conduct a "knock and talk" is not a Fourth Amendment search.  Florida v. Jardines,

133 S. Ct. at 1423 (Alito, J., concurring).  Given that "Detective Bartelt did not exceed the scope

of the license to approach respondent's front door," Justice Alito took issue with the majority's

conclusion "that Detective Bartelt went too far because he had the 'objectiv[e] . . . purpose to

conduct a search.'"  133 S. Ct. at 1423 (Alito, J., dissenting)(emphasis in original).  According to

Justice Alito, because approaching a house to conduct a knock and talk is not a search,

> [w]hat the Court must fall back on, then, is the particular instrument that
> Detective Bartelt used to detect the odor of marijuana, namely, his dog. But in the
> entire body of common-law decisions, the Court has not found a single case
> holding that a visitor to the front door of a home commits a trespass if the visitor
> is accompanied by a dog on a leash.  On the contrary, the common law allowed
> even unleashed dogs to wander on private property without committing a trespass.
>
> The Court responds that "[i]t is not the dog that is the problem, but the
> behavior that here involved use of the dog."  But where is the support in the law
> of trespass for this proposition? Dogs' keen sense of smell has been used in law
> enforcement for centuries. The antiquity of this practice is evidenced by a Scottish
> law from 1318 that made it a crime to "disturb a tracking dog or the men coming
> with it for pursuing thieves or seizing malefactors."  If bringing a tracking dog to
> the front door of a home constituted a trespass, one would expect at least one case
> to have arisen during the past 800 years.  But the Court has found none.

133 S. Ct. at 1424 (Alito, J., dissenting)(emphasis in original)(internal citations omitted).  Justice

Alito thus concluded: "For these reasons, the real law of trespass provides no support for the

Court's holding today.  While the Court claims that its reasoning has 'ancient and durable roots,'

its trespass rule is really a newly struck counterfeit."  133 S. Ct. at 1424 (Alito, J.,

dissenting)(internal citations omitted).

Justice Alito did not look any more favorably upon Justice Kagan's conclusion that Detective Bartelt's conduct violated Jardines' reasonable privacy expectations, asserting:

> [W]e have already rejected a very similar, if not identical argument, see Illinois v. Caballes, . . . and in any event I see no basis for concluding that the occupants of a dwelling have a reasonable expectation of privacy in odors that emanate from the dwelling and reach spots where members of the public may lawfully stand.

133 S. Ct. at 1424 (Alito, J., dissenting). Justice Kagan asserted that Detective Bartelt's use of Franky, the drug-sniffing dog, was an invasion of Jardines' privacy in his home, because the government's conduct was similar to the conduct in Kyllo v. United States, in which the Supreme Court held that using a thermal imaging device to monitor movements in a home was a Fourth Amendment search. Justice Alito pointed out that "[t]his Court . . . has already rejected the argument that the use of a drug-sniffing dog is the same as the use of a thermal imaging device. The very argument now advanced by the concurrence appears in Justice Souter's Caballes dissent. But the Court was not persuaded." 133 S. Ct. at 1425 (Alito, J., dissenting)(internal citations omitted)(citing Illinois v. Caballes, 543 U.S. at 409-10 and 413 n.3). Justice Alito contended that "Kyllo is best understood as a decision about the use of new technology. . . . A dog, however, is not a new form of 'technology' or a 'device.' And, as noted, the use of dogs' acute sense of smell in law enforcement dates back many centuries." 133 S. Ct. at 1425 (Alito, J., dissenting). Justice Alito therefore concluded that the government's conduct in Florida v. Jardines "did not constitute a trespass and did not violate respondent's reasonable expectations of privacy. I would hold that this conduct was not a search, and I therefore respectfully dissent." 133 S. Ct. at 1426.

### 3.    Standing.

The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's

reasonable privacy expectation -- as one of "standing."   E.g., United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.").   Accordingly, the Court, tracing the Tenth Circuit's language has also referred to this test as one of standing.   See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121).   The Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test has now expressly been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge."   439 U.S. at 133.   Dispensing with this label, the Supreme Court noted:

Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones[ v. United States, 362 U.S. 257 (1960), overruled by United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis.  Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim.  We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  The inquiry under either approach is the same.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.  The Court in Jones also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks.  362 U.S., at 261, 263, 265 . . . .

439 U.S. at 138-39.  The Supreme Court emphasized:

[N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . .  But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40.  In Minnesota v. Carter, the Supreme Court recognized that Rakas v. Illinois

put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth

Amendment search analysis:

The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . .  Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."  Id., at 140 . . . .

525 U.S. at 87-88.  The Supreme Court has thus noted that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same and that Katz v. United States' reasonable-expectation-of-privacy analysis has now been classified as a substantive Fourth Amendment test, as opposed to a standing test.  Rakas v. Illinois, 439 U.S. at 139.

Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.

Rakas v. Illinois, 439 U.S. at 139 (footnote omitted).  This development is in line with the Supreme Court's guidance that the analysis "is more properly subsumed under substantive Fourth Amendment doctrine."  Rakas v. Illinois, 439 U.S. at 139.

**4.      Whether a Fourth Amendment Search Occurred.**

A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government, to collect information, violates a person's subjective expectation of privacy that society recognizes as reasonable.  See United States v. Jones, 132 S. Ct. at 947.  "[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test."  United States v. Jones, 132 S. Ct. at 947 (emphasis in original)(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992)).  "When 'the Government obtains information by

- 52 -

physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3).

     **a.**       **Trespass-Based Analysis.**

The Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3 ("[A] 'search' within the original meaning of the Fourth Amendment" occurs "[w]here . . . the Government obtains information by physically intruding on a constitutionally protected area.")). "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation." United States v. Jones, 132 S. Ct. at 951 n.5 (Scalia, J.)(emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]respass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 132 S. Ct. at 951 n.5. The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529 U.S. 334, 337 (2000). Moreover, the Supreme Court in Florida v. Jardines suggested that the trespass-based analysis applies only when the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what

> we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . .  But when it comes to the Fourth Amendment, the home is first among equals.

133 S. Ct. at 1414.

In United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), the Court analyzed whether the Secret Service's digital scan of electronic information contained in the defendants' credit and debit cards' magnetic strips was a Fourth Amendment search under a trespass-based analysis, concluding that it was not, because the Secret Service properly possessed the credit and debit cards, and the additional act of scanning the cards to read the virtual data contained on the strips did not involve a physical intrusion or physical penetration of space.  See 943 F. Supp. 2d at 1264-65.  The Court noted that, "[e]ven if the Supreme Court were to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally protected area.  943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes.  In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip.  Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in their persons, houses, papers, and effects . . . ."  U.S. Const. amend IV.

943 F. Supp. 2d at 1273 (alteration in original).

- 54 -

> ### b.   <u>Katz v. United States</u>' Reasonable-Expectations-of-Privacy Search Test Remains Good Law.

The Court has noted that, in light of the Supreme Court's recent decisions in <u>Florida v. Jardines</u> and <u>United States v. Jones</u>, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the <u>Katz v. United States</u> reasonable-expectation-of-privacy test is still good law." <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1242 (citing <u>Minnesota v. Carter</u>, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)). Justice Scalia has consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the <u>Katz</u> test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in <u>Katz</u> . . .) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable. When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has <u>occurred</u> (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment. That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'" Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the <u>Constitution</u> would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

<u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(internal citations omitted).[16] In both <u>United States v. Jones</u> and <u>Florida v. Jardines</u>, however, Justice Scalia, writing for the majority, never stated that the Supreme Court was substituting the trespass-based analysis for <u>Katz v. United States</u>' reasonable-expectation-of-privacy analysis. Rather, his majority opinions asserted that the <u>Katz v. United States</u> reasonable-expectation-of-

---

[16]The Honorable Clarence Thomas, Associate Justice, was the only other Justice to join Justice Scalia's <u>Minnesota v. Carter</u> concurrence.

privacy analysis added to the trespass-based analysis.  See Florida v. Jardines, 133 S. Ct. at 1417

("The Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional

property-based understanding of the Fourth Amendment." (emphasis in original))(quoting United

States v. Jones, 132 S. Ct. at 952).  The Court concluded in United States v. Alabi that, "as the

Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere

to application of the Katz v. United States reasonable-expectation-of-privacy Fourth Amendment

analysis, at least as a possible approach alongside of the trespass-based approach."  2013 WL

1876791, at *35.

        In June, 2013, Justice Scalia dissented from the Supreme Court's decision in Maryland v.

King, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of

arrestees is a reasonable search that can be considered part of a routine booking procedure," 133

S. Ct. at 1980.  Justice Scalia criticized the majority's opinion for analogizing DNA testing to

taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have

never held that merely taking a person's photograph invades any recognized 'expectation of

privacy.'"  Maryland v. King, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also

pointed out that a person's "privacy-related concerns" in their body are weighty:

        We are told that the "privacy-related concerns" in the search of a home
    "are weighty enough that the search may require a warrant, notwithstanding the
    diminished expectations of privacy of the arrestee." But why are the "privacy-
    related concerns" not also "weighty" when an intrusion into the body is at stake?
    (The Fourth Amendment lists "persons" first among the entities protected against
    unreasonable searches and seizures.)

Maryland v. King, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphasis in original).  Justice Scalia

also suggested that the Founders would have shared these privacy-related concerns:

        Today's judgment will, to be sure, have the beneficial effect of solving
    more crimes; then again, so would the taking of DNA samples from anyone who
    flies on an airplane (surely the Transportation Security Administration needs to

> know the "identity" of the flying public), applies for a driver's license, or attends a public school.  Perhaps the construction of such a genetic panopticon is wise.  But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

Maryland v. King, 133 S. Ct. at 1989 (Scalia J., dissenting).  The Court therefore concludes that Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.  See Apodaca v. New Mexico Adult Probation and Parole, No. CIV 13-0113 JB/SMV, 2014 WL 712588, at *14 (D.N.M. Feb. 13, 2014)(Browning, J.)(reaching this conclusion).

### c.    Katz v. United States' Reasonable-Expectations-of-Privacy Analysis.

"'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'"   Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. at 174).  "A district court cannot suppress evidence unless the movant proves that a search implicates personal Fourth Amendment interests."  United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original).  "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'"  United States v. Miller, 425 U.S. 435, 440 (1976)(Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).[17]  The Tenth

---

[17]The Court has previously stated: "[T]he Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area.'"  Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting Katz. V. United States, 389 U.S. at 351).  In support for this proposition, the Court relied on the majority's decision in Katz v. United States, where the Supreme Court stated that focusing on whether the area is a "constitutionally protected area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

Circuit has thus noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched." United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)). Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable." Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.).

--------

Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls. The petitioner has strenuously argued that the booth was a "constitutionally protected area." The Government has maintained with equal vigor that it was not. But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See Lewis v. United States, 385 U.S. 206, 210 [1966]; United States v. Lee, 274 U.S. 559, 563 . . . (1927). But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. See Rios v. United States, 364 U.S. 253 . . . [1960]; Ex parte Jackson, 96 U.S. 727, 733 . . . [1877].

Katz v. United States, 389 U.S. at 351-52. The Supreme Court appears to have changed course in its two most recent opinions on Fourth Amendment searches. In Florida v. Jardines, the particular place at which the search occurred weighs heavily on the Supreme Court's holding, reasoning that "[t]he [Fourth] Amendment establishes [as] a simple baseline . . . . protections 'when the Government does engage in a physical intrusion of a constitutionally protected area.'" 133 S. Ct. at 1414 (original alterations and original emphasis omitted)(emphasis added)(quoting United States v. Knotts, 460 U.S. 276, 286 (1983)(Brennan, J., concurring)). See United States v. Jones, 132 S. Ct. at 951 ("Katz did not erode the principle 'that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment. . . . Katz did not narrow the Fourth Amendment's scope.'" (emphasis added)). The Court thus concludes that, while it may be true that the analysis does not turn on the place searched, the Court's prior statement -- "the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area,'" Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d at 1219 -- may no longer accurately reflect the Supreme Court's recent reversion to property-based analysis as a Fourth Amendment analysis baseline.

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  The Supreme Court has thus recognized that, rather than determining whether law enforcement conduct was a search, it sometimes proves easier to "assess[] when a search is not a search."  Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in Katz v. United States.  Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth.  As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33.  The Supreme Court thus articulated the Katz v. United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004)(citing Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 383-388 (1974)(criticizing this formulation of the standard and explaining that "the common formula for Katz fails to capture Katz at any point because the Katz decision was written to resist captivation in any formula") --  which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. at 211).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property

law or to understandings that are recognized and permitted by society.'"  United States v. Jones,

132 S. Ct. at 951.  See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a

reasonable expectation of privacy exists, courts consider concepts of real or personal property

law . . . .").   In analyzing whether an expectation of privacy is reasonable in the Fourth

Amendment context based on property law, "arcane distinctions developed in property and tort

law between guests, licensees, invitees, and the like, ought not to control."  Rakas v. Illinois, 439

U.S. at 143 & n.12.  While ownership or lawful possession is not determinative under the Katz v.

United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the

Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he

gained possession [of the area searched] from the owner or someone with the authority to grant

possession."  United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

### i.        Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when the defendant "has

shown that 'he sought to preserve something as private.'"  Bond v. United States, 529 U.S. at

338 (internal alterations omitted)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).  Thus,

there is no reasonable expectation of privacy in otherwise private information disclosed to a third

party.  Under the Katz v. United States expectation-of-privacy test -- although perhaps not under

United States v. Jones and Florida v. Jardines -- "[t]he Fourth Amendment protects people, not

places.   What a person knowingly exposes to the public . . . is not a subject of Fourth

Amendment protection."  Katz v. United States, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the
> obtaining of information revealed to a third party and conveyed by him to
> Government authorities, even if the information is revealed on the assumption that
> it will be used only for a limited purpose and the confidence placed in the third
> party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect.  In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.  For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects.  Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.   In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

442 U.S. at 740 n.5.  Most recently, in Jones v. United States, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.  This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.  People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.18  Perhaps, as Justice

---

[18]URL is the abbreviation for a "uniform resource locator, . . . .  URLs occur most commonly to reference web pages (http), but are also used for file transfer (ftp), email (mailto), database access (JDBC), and many other applications."   Uniform Resource Locator,

Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not. I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted). Regardless what the Supreme Court decides to do with social media on the internet, only the most ignorant or gullible think what they post on the internet is or remains private. See United States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley, J.)(holding that a person posting to his Facebook profile had "no justifiable expectation that his 'friends' would keep his profile private").

###          ii.      Privacy Expectation that Society is Prepared to Recognize as Reasonable.

Under the second step of Katz v. United States' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable." United States v. Ruiz, 664 F.3d at 838. The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities." United States v. Jacobsen, 466 U.S. 109, 122 (1984). Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values which the Fourth Amendment protects. See California v. Ciraolo, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual

_____

Wikipedia.org, http://en.wikipedia.org/wiki/ Uniform_resource_locator (last visited July 31, 2015).

chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")(quoting Oliver v. United States, 466 U.S. at 181-83).  This second factor of the Katz v. United States reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'"  LaFave, supra §2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353).  Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or legitimate.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  In United States v. Place, the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment."  United States v. Place, 462

U.S. at 707.  The case arose when law enforcement seized the luggage of an airline passenger

and transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at

699.  The drug sniffing dog alerted the officers that drugs were in the luggage, the officers

obtained a search warrant, and, upon opening the bags, the officers found over one-thousand

grams of cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable

expectation of privacy in the contents of his or her luggage, the Supreme Court held that the

dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the

investigative technique, which could disclose only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of
> personal luggage that is protected by the Fourth Amendment.  A "canine sniff" by
> a well-trained narcotics detection dog, however, does not require opening the
> luggage. It does not expose noncontraband items that otherwise would remain
> hidden from public view, as does, for example, an officer's rummaging through
> the contents of the luggage.  Thus, the manner in which information is obtained
> through this investigative technique is much less intrusive than a typical search.
> Moreover, the sniff discloses only the presence or absence of narcotics, a
> contraband item.   Thus, despite the fact that the sniff tells the authorities
> something about the contents of the luggage, the information obtained is limited.
> This limited disclosure also ensures that the owner of the property is not subjected
> to the embarrassment and inconvenience entailed in less discriminate and more
> intrusive investigative methods.
>
> In these respects, the canine sniff is *sui generis*.  We are aware of no other
> investigative procedure that is so limited both in the manner in which the
> information is obtained and in the content of the information revealed by the
> procedure.  Therefore, we conclude that the particular course of investigation that
> the agents intended to pursue here -- exposure of respondent's luggage, which
> was located in a public place, to a trained canine -- did not constitute a "search"
> within the meaning of the Fourth Amendment.

462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical

field test of a white powdery substance to reveal that the substance was cocaine.  See 466 U.S. at

122-24.  A Federal Express employee and supervisor had opened a damaged package, and

exposed four zip-lock plastic bags containing six and one-half ounces of white powder.  See 466 U.S. at 111.  They then called the DEA and repacked the contents in the original packaging, before they provided the package to the DEA officers.  See 466 U.S. at 111.  When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine.  See 466 U.S. at 111-12.  The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

> The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search.  It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

466 U.S. at 120 (footnote omitted).  The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment."  United States v. Jacobsen, 466 U.S. at 122.  The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine.  It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?
>
> . . . .
>
> A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.  This conclusion is not dependent on the result of any particular test.  It is probably safe

to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.  But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest.  Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

. . . .

Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[19]  The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the line of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at] governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interests.'"  Illinois v. Caballes, 543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123)(emphasis in original).  The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared

---

[19]The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes.  Out of the current Supreme Court Justices, Justices Scalia, Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented.  See 543 U.S. at 405.

to consider reasonable.'" Illinois v. Caballes, 543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S. at 122). The Supreme Court in Illinois v. Caballes noted that its decision was consistent with Kyllo v. United States, as the thermal imaging device in Kyllo v. United States could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. Kyllo v. United States, 533 U.S. 27 . . . . Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath." Id., at 38 . . . . The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

Illinois v. Caballes, 543 U.S. at 409-10.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants." 943 F. Supp. 2d at 1275. The Court reluctantly accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- i.e., intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable," 943 F. Supp. 2d at 1280. The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully . . . ." 943 F. Supp. 2d at 1281.

Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals."  943 F. Supp. 2d at 1287.

### 5.    Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).    See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).   "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121 (citing, as an e.g. cite, Terry v. Ohio, 392 U.S. 1 (1968)).  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is

needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118). See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the Tenth Circuit look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. 112, 119-120 (2001)(noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and

informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, noting: "Those who have never been convicted of a felony are the last distinct category. What is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.   This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s] our 'shared social expectations' of what places should be free from governmental incursions."   Florida v. Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (internal citations omitted).

**6.    Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is

"freely and voluntarily given," the search does not implicate the Fourth Amendment.   United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).   The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government (i) "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,'" and (ii) "the officers must have used no 'implied or express duress or coercion.'"   United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.   See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."   United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).   Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."   United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original).   See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no

one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

   **7.**      **Legal Standard for Probable Cause in an Affidavit in Support of a Warrant.**

   Probable cause must support a search warrant, which requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between

suspected criminal activity and the place to be searched."  United States v. Corral-Corral, 899

F.2d 927, 937 (10th Cir. 1990).  The task of the magistrate judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the
> circumstances set forth in the affidavit before him, including the veracity and
> basis of knowledge of persons supplying hearsay information, there is a fair
> probability that contraband or evidence of a crime will be found in a particular
> place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(quoting Illinois v.

Gates, 462 U.S.213, 238 (1983)).  See United States v. Glover, 104 F.3d 1570, 1578

(10th Cir. 1997)(finding that, in determining whether an affidavit supports a finding of probable

cause, the court must review the affidavit as a whole and look to the totality of the information

contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009).

In making his or her determination, the magistrate judge "may draw reasonable inferences from

the material provided in the warrant application."  United States v. Rowland, 145 F.3d 1194,

1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of

probable cause."  United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to

ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause

existed."  Illinois v. Gates, 462 U.S. at 236, 238-39.  This deference is appropriate to further the

Fourth Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727,

733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the

constitutionality of a search warrant should begin with the rule that the informed and deliberate

determinations of magistrates empowered to issue warrants . . . are to be preferred over the

hurried action of office[r]s . . . .").  Because of the strong preference for warrants, "in a doubtful

or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.

The deference accorded a magistrate judge's probable cause determination, however, is not boundless.  See United States v. Leon, 468 U.S. 897, 914 (1984).  The Court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause.  See United States v. Danhauer, 229 F.3d at 1006.  Specifically, the Court should not defer to a magistrate judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances."  United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

**8.      The Particularity Requirement for Search Warrants.**

The Supreme Court has stated that "those searches deemed necessary should be as limited as possible."  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  The Tenth Circuit has explained that "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized."  Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009)(quoting United States v. Leary, 846 F.2d 592, 600 (10th Cir. 1988)).  The particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant.  See Voss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir. 1985)("The particularity requirement ensures that a search is confined in scope to particularly described

evidence relating to a specific crime for which there is demonstrated probable cause."); United States v. Janus Indus., 48 F.3d 1548, 1553 (10th Cir. 1995)("'As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'")(quoting Stanford v. Texas, 379 U.S. 476, 485 (1965))).  "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  United States v. Janus Indus., 48 F.3d at 1553 ("The test applied to the description of the items to be seized is a practical one.").

In Cassady v. Goering, the search warrant authorized the search of the plaintiff's entire farm, including his house, and the seizure of "[a]ny & all narcotics," "[a]ny and all illegal contraband," and various specific items mostly related to a narcotics operation, as well as the search and seizure of "all other evidence of criminal activity" and all personal property that was stolen, embezzled, or otherwise illegal.  567 F.3d at 635.  The Tenth Circuit found that the warrant violated the plaintiff's Fourth Amendment rights, because "[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the Fourth Amendment proscribes." 567 F.3d at 635 (quoting Voss v. Bergsgaard, 774 F.2d at 405).  The Tenth Circuit in Cassady v. Goering explained that it had previously "applied a blanket suppression where officers *conducted a general search for evidence* of crimes not specifically listed in the warrant," 567 F.3d at 643 (emphasis in original)(citing United States v. Foster, 100 F.3d 846, 851-52 (10th Cir. 1996); United States v. Medlin, 842 F.2d 1194, 1199-1200 (10th Cir. 1988)); given that line of cases, the Tenth Circuit said "it would be an odd result not to suppress *warrants that expressly authorize* a general search and seizure," Cassady v. Goering, 567 F.3d at 643 (emphasis in original).

9.      **Warrantless Searches of Homes**.

"[T]he warrantless entry of the home is 'the chief evil against which . . . the Fourth Amendment is directed.'"   United States v. Lowe, 999 F.2d 448, 451 (10th Cir. 1993)(quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).  "A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent."   United States v. Pikyavit, 527 F.3d 1126, 1130 (10th Cir. 2008).  The Fourth Amendment's protection of the home against warrantless searches extends to a home's curtilage.  See United States v. Dunn, 480 U.S. 294 (1987); Oliver v. United States, 466 U.S. 170 (1984).

a.      **Curtilage**.

In United States v. Dunn, the Supreme Court articulated four factors that should be used when determining whether an area is within the curtilage of a house for Fourth Amendment purposes.  These factors are

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

480 U.S. at 301.  Backyards that are enclosed and adjacent to a house are generally considered to be part of the curtilage.  See United States v. Hatfield, 333 F.3d 1189, 1196 (10th Cir. 2003); United States v. Jenkins, 124 F.3d 768, 772-73 (6th Cir. 1997).  Even partially enclosed backyards have been found to be part of a home's curtilage.  See, e.g., United States v. Swepston, 987 F.2d 1510, 1515 (10th Cir. 1993)(holding partial enclosure consistent with area being curtilage), overruled in part on other grounds by United States v. Cousins, 455 F.3d 1116 (10th Cir. 2006); United States v. Jenkins, 124 F.3d at 773 (same).

b.      **Consent.**

A warrantless search is constitutional if consent is given for the search.  Consent to a search must be unequivocal, specific, and freely given.  See United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007); United States v. Davis, 197 F.3d 1048, 1052 (10th Cir. 1999); United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992).  Consent does not need to be spoken, but "may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at 789-90.  "Non-verbal conduct, considered with other factors, can constitute voluntary consent to search."  United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999).  In United States v. Gordon, for example, the Tenth Circuit found implied consent when, in response to an officer's question whether the defendant could open a locked bag, the defendant handed the officer the key.  See 173 F.3d at 766.

One strategy to gain consent to a search is a knock and talk, and the knock and talk itself is not a search.  "[P]olice officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a 'knock and talk,' i.e., knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence."  Florida v. Jardines, 133 S. Ct. at 1423 (Alito, J., dissenting).

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do.  And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak.

Kentucky v. King, 131 S. Ct. 1849, 1862 (2011).   The Tenth Circuit has explained that reasonable suspicion is unnecessary for a knock-and-talk investigation, because, "[a]s commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion."  United States v. Cruz-Mendez, 467 F.3d

1260, 1264 (10th Cir. 2006).   Police officers may approach a home, entering the curtilage surrounding that home that would be the normal route of access to the home, and knock, "precisely because that is 'no more than any private citizen might do,'" United States v. Shuck, 713 F.3d 563, 568 (10th Cir. 2013)(quoting Florida v. Jardines, 133 S. Ct. at 1416)).

        **c.**      **Exigent Circumstances.**

A warrantless search of a home can also be constitutional when there are exigent circumstances.   For exigent circumstances regarding safety to justify a warrantless search of a home: "(1) the officers [must have] had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves or others, and (2) the conduct of the entry [must have been] reasonable."   United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008).   See United States v. Smith, 797 F.2d 836, 840 (10th Cir. 1986).   While officers do not need probable cause to establish that exigent circumstances existed, "there must be some reasonable basis, approaching probable cause," supporting the search of the area.   United States v. Smith, 797 F.2d at 840 (internal quotation marks omitted).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."   Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).   "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"   Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).   The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought

against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs" and operates to protect officers from the law's sometimes "hazy border[s]." Saucier v. Katz, 533 U.S. at 205. When a defendant asserts qualified immunity, the plaintiff must

demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

       **1.**       **Procedural Approach to Qualified Immunity.**

       In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan, 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."   555 U.S. at 237.   The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a

qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42)20(internal quotation marks

---

[20]As former-Tenth Circuit judge, and now Stanford Law School professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).  This practice is good for the nation's judicial system to achieve uniformity in to a nation of 319 million people.  See, e.g., Michigan v. Long, 463 U.S. 1032, 1040 (1983)(stating that "there is an important need for uniformity in federal law").  But see Amanda Frost, Overvaluing Uniformity, 94 Va. L. Rev. 1567 (2008)(criticizing courts' focus on uniformity of the law).  If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signals of its superior courts, it would appear that Justice Alito in Pearson v. Callahan and Judge Gorsuch in Kerns v. Bader are trying to suggest that district courts should, whenever possible, decide qualified immunity on the clearly established prong.  For example, Justice Alito and

omitted).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. at 2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[21]

---

Judge Gorsuch gave seven situations when the Court should decide a case solely on the clearly established element and not "avoid avoidance."  Kerns v. Bader, 663 F.3d at 1180-81.  Even the phrase "avoid avoidance" suggests that the district court is to generally avoid, not decide, the constitutional issue.

       The Court is concerned about this push to not decide constitutional issues, for a number of reasons.  The Court set forth some of these in Kerns v. Board of Education, which the Court quotes in note 48.  See infra note 48.  Additionally, there is a practical problem. Sometimes, for a district court to really know whether a right is clearly established, it has to do the first analysis, and thoroughly explore whether there is a right and whether it has been violated.  If it jumps to the mushy, hazy area of clearly established without knowing what the right is, the analysis lacks any precision.  While appellate courts may think that jumping to the clearly established prong saves district courts a lot of trouble, in the Court's experience, the old rule -- in Saucier v. Katz -- made more sense and, practically, is the way the Court still has to go in many cases.

[21]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

_____

While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.   A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.   See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . .  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v.

insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level.");  Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations).

Callahan, 555 U.S. at 236-37).  See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones." [22]).  The

_____

[22]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.
>
> If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations.

Tenth Circuit will remand a case to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

## 2. Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

---

See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. at 640.   "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).   A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d at 1298.

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff:  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help

in determining whether the violative nature of particular conduct is clearly established."
Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined
is important, because qualified immunity shields officers who have "reasonable, but mistaken
beliefs" as to the application of law to facts and operates to protect officers from the law's
sometimes "hazy border[s]."  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if
the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly
established where "a distinction might make a constitutional difference."  663 F.3d at 1188
(emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit
explained that the relevant question "wasn't whether we all have some general privacy interest in
our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked
legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying
the level of generality at which a legal rule must be defined, applied a sliding scale to determine
when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d at 1284 ("The
more obviously egregious the conduct in light of prevailing constitutional principles, the less
specificity is required from prior case law to clearly establish the violation.").  "[W]hen an
officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second
decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509
F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving
fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. at 741.

In Rivera v. Bates, No. CIV 12-0473 JB/RHS, 2014 WL 3421050 (D.N.M. June 21,
2014)(Browning, J.), the Court used the Kerns v. Bader qualified-immunity framework to
determine if it was clearly established that arresting a suspect in his underwear and failing to

retrieve his clothing to cover him up while he is transported from his house to a patrol car makes the arrest unreasonable.  See 2014 WL 3421050, at *54.  The Court stated:

> Even if the Court could, on the record before it, conclude, as a matter of law, that the manner in which Hernandez effectuated the arrest was [un]reasonable, the Court finds that the law was not clearly established such that a reasonable officer in Hernandez' position would have recognized that he needed to retrieve clothing for S. Rivera rather than escort him directly to the police vehicle.  As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction *might* make a constitutional difference."  Kerns v. Bader, 663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was *beyond debate* in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Here, S. Rivera has relied on Cortez v. McCauley to establish that his clearly established rights were violated, but the Tenth Circuit in that case stated that it had "little difficulty concluding that a small amount of force, like grabbing Rick Cortez and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment."  663 F.3d at 1128.  The Tenth Circuit only made one comment regarding Cortez' clothing during the arrest:
>
>> Although the dignity aspects of this arrest are troubling, specifically hauling Rick Cortez (clad only in his shorts) into the patrol car in the middle of the night without any explanation, the police were investigating a serious felony and claimed a need for quick action to separate the accused from any other children that might be in the home.
>
> 478 F.3d at 1128-29.  The Tenth Circuit did not explain what would have to be different about the "dignity aspects" for the arrest to violate the Fourth Amendment.  More importantly, the Court emphasizes that Hernandez did not participate in any of the alleged wrongdoing inside S. Rivera's house, nor did he refuse to allow S. Rivera to get dressed; instead, Hernandez was involved in the arrest only after S. Rivera was outside the house.  S. Rivera has not pointed to, nor has the Court been able to identify, any cases that demand that an officer delay taking the arrestee to a police vehicle so the officer can enter the arrestee's home to search for clothing or otherwise find some covering for an arrestee on the way to the police vehicle.  The Court will thus grant the MSJ on S. Rivera's excessive and unreasonable force claim against Hernandez.

Rivera v. Bates, 2014 WL 3421050, at *54 (emphasis in original).

<u>**ANALYSIS**</u>

The Court will grant the Motion in part and deny it in part.  First, the Court cannot determine whether collateral estoppel bars McGrath's due process and equal protection claims. Second, Count 1 of the Complaint -- which contains McGrath's due process and equal protection claims -- does not state a plausible claim, and McGrath has presented no evidence to support his allegations.  Third, Count 3 does not state a plausible Fourth Amendment unlawful search claim against Rizzieri, Berry, and Perry, and no evidence supports McGrath's allegations.  Fourth, McGrath has not shown that the City of Albuquerque had a policy or custom that directly caused its employees to violate McGrath's constitutional rights.  Fifth, the Court will remand McGrath's remaining state-law claims against the City Management Defendants.  The Court will dismiss with prejudice McGrath's federal claims against the City Management Defendants, and remand McGrath's state-law claims to the Second Judicial District Court.

## I.      **THE COURT CANNOT DETERMINE WHETHER COLLATERAL ESTOPPEL BARS MCGRATH'S DUE PROCESS AND EQUAL PROTECTION CLAIMS.**

The City Management Defendants contend that collateral estoppel precludes McGrath's due process and equal protection claims.  <u>See</u> Motion at 2.  They argue that "those events were the subject of previous legal proceedings in" <u>McGrath v. City of Albuquerque</u>.  Motion at 2.  The City Management Defendants explain that

> <u>McGrath v. City of Albuquerque</u>, originated in City of Albuquerque Personnel Board appeals, PB-08-09 and PB-10-14 as an appeal of McGrath's termination of his employment pursuant to the City's Merit System Ordinance, ROA §3-1-1 et seq.; upon the City's appeal to the New Mexico Second Judicial District Court number was assigned CV-2011-0752; upon the City's removal to the federal district court of New Mexico was assigned CIV-11-1030 JCH/KBM; then remanded back to the Second Judicial District Court upon McGrath's motion to remand which the Second Judicial Court has since remanded the case to the City's Personnel Board.

Motion at 2 n.1.  The City Management failed to provide, however, any opinion, order, or decision from that case from either the Second Judicial District Court or the Personnel Board. The Court has similarly been unable to track down an opinion on its own.  Moreover, the notice of removal from that case lists City of Albuquerque as the Plaintiff/Appellant and McGrath as the Defendant/Appellee.  See City of Albuquerque v. McGrath, No. CIV 11-1030 JCH, Notice of Removal, filed November 21, 2011 (Doc. 1).  CM/ECF shows that, although McGrath attempted to file a complaint in federal court for that case, Judge Herrera did not rule on that motion before remanding the case to the Second Judicial District.  It is unclear whether McGrath filed counter claims in the state court case.  Accordingly, the Court does not have sufficient information to determine whether collateral estoppel bars McGrath's due process and equal protection claims, and the information that the Court has -- which shows that McGrath was a defendant in that case and that the City of Albuquerque was the plaintiff -- suggests that McGrath's claims are not precluded.

## II.     COUNT 1 -- DUE PROCESS AND EQUAL PROTECTION -- DOES NOT STATE A CLAIM, AND NO EVIDENCE SUPPORTS MCGRATH'S ALLEGATIONS.

The Court will grant the Motion as to Count 1.  Count 1 does not recite any recognized equal-protection claim, and no facts alleged would support such a claim.  Moreover, the undisputed facts show that McGrath did not pursue available process and voluntarily relinquished his property interest in continued employment by failing to report after he was reinstated; he has, therefore, waived his due process claim.

Count 1 of the Complaint reads:

### DUE PROCESS AND EQUAL PROTECTION

41.     As classified, full-time employee Plaintiff was entitled to due process of law, including the right to notice of the charges against him, an

opportunity to be heard before action was taken against him, and a full and fair post-termination hearing.

42.     The City terminated McGrath under its zero tolerance policy, then "reinstated" him while he was represented by counsel and in the middle of the Personnel Board's hearing process on his 2008 termination.

43.     After the Personnel board finally approved his reinstatement, Ms. Forney and Ms. Rizzieri refused to reinstate McGrath or pay back pay while their "appeal" was pending.

44.     The Personnel Board failed to enforce its reinstatement and back pay order.

45.     Defendants denied McGrath the process to which he was entitled the first time they fired him; they fired him a second time and "appealed" the ruling reinstating McGrath without providing any relief or reinstatement.  Now Ms. Forney has fired him a third time.

46.     With respect to all the terminations of his employment, the City failed to afford McGrath real, adequate or effective process at a meaningful time, with the result that he has been deprived of the City employment to which he is entitled, all without just cause or reasonable basis in fact or law, for almost six years.

47.     Defendants unreasonably and arbitrarily applied harsh standards and demanded compliance with their otherwise invalid "rules," all in the process of effecting the termination of McGrath's employment under the City's invalid zero-tolerance policy.

48.     As an integral part of their termination of Michael McGrath's employment as a bus driver, Ms. Forney and the defendant City officials made false, misleading, and stigmatizing contentions that McGrath drove a City bus while impaired by drugs.

49.     Based on the facts set out above, the City of Albuquerque, Robert Perry, Bruce Rizzieri, Paula Forney and the City's Personnel Board violated Plaintiff's rights to substantive and procedural due process of law and fair and equal treatment, and Plaintiff is entitled to injunctive and declaratory relief and damages.

Complaint ¶¶ 41-49, at 8-9.

A.   **THE COURT WILL GRANT SUMMARY JUDGMENT IN FAVOR OF THE CITY MANAGEMENT DEFENDANTS ON MCGRATH'S EQUAL-PROTECTION CLAIM.**

The Complaint's allegations do not recite any recognized equal protection claim. "Generally, to state a claim under § 1983 for violation of the equal protection clause, the plaintiff must show that he or she is a member of a class of individuals that is being treated differently from similarly situated individuals that are not in that class." Aragon v. San Jose Ditch Ass'n, No. CIV 10-0563 JB/RHS, 2011 WL 6013284, at *13 (D.N.M. Nov. 22, 2011)(Browning, J.). No such allegations appear in the Complaint. Further, "[t]o state an equal-protection claim against a municipality in the employment context, the plaintiff must show that the defendant's conduct, taken under color of law: (i) constitutes an adverse employment action; (ii) was motivated by a discriminatory intent; and (iii) was pursuant to the defendant's policy or custom." Hunt v. Cent. Consol. Sch. Dist., 951 F. Supp. 2d 1136, 1186 (D.N.M. 2013)(Browning, J.). Count 1 contains no allegation of discriminatory intent or the existence of policy or custom. Moreover, there is no allegation of a "class of one" case, nor could there be: the Supreme Court has held that "the class-of-one theory of equal protection does not apply in the public employment context." Engquist v. Or. Dep't of Agric., 553 U.S. 591, 598 (2008). Finally, even if this is not a public employment complaint, McGrath has not alleged all the elements of a class-of-one equal-protection claim. The Tenth Circuit has explained:

> To prevail on this theory, a plaintiff must first establish that others, "similarly situated in every material respect" were treated differently. Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d 1202, 1210 (10th Cir. 2006). A plaintiff must then show this difference in treatment was without rational basis, that is, the government action was "irrational and abusive," id. at 1211, and "wholly unrelated to any legitimate state activity," Mimics, Inc. [v. Vill. of Angel Fire, 394 F.3d 836, 849 (10th Cir. 2005)](quotation omitted). This standard is objective -- if there is a reasonable justification for the challenged action, we do not inquire into the government actor's actual motivations. Moreover, no facts alleged would support an equal-protection claim.

Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1216 (10th Cir. 2011).  Accordingly, the

Court will dismiss McGrath's equal-protection claim.

McGrath's blanket invocation of "Defendants" -- without identifying any specific people

-- is insufficient to state a claim.  As the Tenth Circuit has explained,

> [i]n § 1983 cases, defendants often include the government agency and a number
> of government actors sued in their individual capacities.   Therefore it is
> particularly important in such circumstances that the complaint make clear exactly
> *who* is alleged to have done *what* to *whom,* to provide each individual with fair
> notice as to the basis of the claims against him or her, as distinguished from
> collective allegations against the state.

Robbins v. Oklahoma, 519 F.3d at 1249-50 (emphasis in original).  In Robbins v. Oklahoma, the

Tenth Circuit concluded that a complaint failed to satisfy rule 8's fair notice requirement,

because, "[g]iven the complaint's use of either the collective term 'Defendants' or a list of the

defendants named individually but with no distinction as to what acts are attributable to whom, it

[was] impossible for any of these individuals to ascertain what particular unconstitutional acts

they are alleged to have committed."  519 F.3d at 1250.  The same reasoning applies here: that

the reader cannot parse which Defendants McGrath alleges did what allegedly illegal things is,

standing alone, enough to justify dismissing Count 1 for failure to state a claim.

### B.   THE COURT WILL GRANT SUMMARY JUDGMENT IN FAVOR OF THE CITY MANAGEMENT DEFENDANTS ON MCGRATH'S DUE PROCESS CLAIM.

McGrath's due process claim also fails.  First, he waived his procedural due process

claim by failing to pursue the procedures available to him.  Second, he voluntarily relinquished

his property interest in continued employment by failing to report after he was reinstated.

### 1.    McGrath waived his procedural due process claim.

The Tenth Circuit has held that a plaintiff waives his or her right to procedural due process where the plaintiff fails to take advantage of the procedures available.  See Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J, 464 F.3d 1182, 1194-95 (10th Cir. 2006)(citing Sandoval v. Boulder, 388 F.3d 1312, 1328-29 (10th Cir. 2004)); Luellen v. E. Chicago, 350 F.3d 604, 616 (7th Cir. 2003); Duprey v. Twelfth Judicial Dist. Ct., No. CIV 08-0756, 2009 WL 2482170, at *16 (D.N.M. July 28, 2009)(Browning, J.)(citing Lee v. Regents of Univ. of Cal., 221 F. App'x 711, 714 (10th Cir. 2007)(unpublished)).  This waiver holds if the plaintiff fails to take advantage of post-deprivation proceedings, even if the plaintiff alleges that pre-deprivation proceedings were biased.  See Lee v. Regents of Univ. of Cal., 221 F. App'x at 714 (holding that a plaintiff "waived any challenge to the fairness of the . . . post-termination hearing procedures because he never requested a post-termination hearing").  In Lee v. Regents of University of California, the Tenth Circuit relied on Alvin v. Suzuki, 227 F.3d 107 (3d Cir. 2000), an opinion decided by a unanimous panel consisting of the Honorable Samuel A. Alito, Jr., then-Circuit Judge for the United States Court of Appeals for the Third Circuit and current Associate Justice for the United States Supreme Court, the Honorable Edward R. Becker, then-Chief Circuit Judge for the United States Court of Appeals for the Third Circuit, and the Honorable Maryanne Trump, Senior Circuit Judge for the United States Court of Appeals for the Third Circuit, in its ruling.  In Alvin v. Suzuki, the United State Court of Appeals for the Third Circuit discussed cases "in which plaintiffs have attempted to make a procedural due process claim, charging that bias has infected a review of its deprivation, although they have not used all of the procedures available to them."  227 F.3d at 118.  The Third Circuit stated:

> [A] discharged employee cannot claim in federal court that he has been denied
> due process because his pretermination hearing was held by a biased individual

> where he has not taken advantage of his right to a post-deprivation hearing before
> an impartial tribunal that can rectify any possible wrong committed by the initial
> decisionmaker.

227 F.3d at 119 (citations omitted)(internal quotation marks omitted).  The Third Circuit further

explained that an employee fails to state a claim for violations of procedural due process after

pursuing a three-level, apparently biased, grievance procedure, if the plaintiff fails to request

arbitration when arbitration is available.  See 227 F.3d at 119.  The Third Circuit reasoned that

such a failure to pursue an available arbitration precluded a due process challenge "even when

the plaintiff allege[d] that the defendants acted in concert to deprive him both of a meaningful

hearing and of arbitration because the administrative process in place ha[s] incorporated

safeguards adequate to resolve these allegations in a manner consistent with the demands of due

process."  227 F.3d at 119 (citations omitted)(internal quotation marks omitted).

The record demonstrates that McGrath had procedures available to him to "present his

side of the story," as well as notice of the charges against him and a forum for the City of

Albuquerque to present evidence.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 546.  "To

effect the reinstatement, Mary Scott sent or caused to be sent a letter to Mr. McGrath and his

attorney Mr. Livingston directing Mr. McGrath to report for work."  Motion ¶ 5, at 13 (setting

forth this fact).  See Scott Aff. ¶ 9, at 3; Oct. 31, 2013, Ltr. at 1.  "Mr. McGrath did not report as

directed; neither he nor his attorney responded to the correspondence."  Motion ¶ 6, at 13 (setting

forth this fact).  See Scott Aff. ¶ 10, at 3.  "Consequently, Mary Scott sent or caused to be sent a

notice of a pre-determination or Loudermill hearing to Mr. McGrath and his attorney regarding

the failure to report."  Motion ¶ 6, at 13 (setting forth this fact).  See Scott Aff. ¶ 10, at 3; Nov.

16, 2013, Ltr. at 1.  "Neither Mr. McGrath nor his attorney responded in any form."  Motion ¶ 6,

at 13 (setting forth this fact).  See Scott Aff. ¶ 10, at 3.  "As a result of Mr. McGrath's failure to

report to work after reinstatement and failure to provide any explanation or justification for the failure to report, Bruce Rizzieri, the Director of the Transit Department, terminated Mr. McGrath's employment."  Motion ¶ 7, at 14 (setting forth this fact).  See Scott Aff. ¶ 11, at 4; Notification of Final Action -- Failure to Report Termination from Employment with the City of Albuquerque (dated Dec. 13, 2013), filed June 18, 2014 (Doc. 17-6).  "Neither Mr. McGrath nor his attorney filed a timely appeal of the termination pursuant to the City's Merit System Ordinance and attendant procedural rules."  Motion ¶ 7, at 14 (setting forth this fact).  See Scott Aff. ¶ 11, at 4.

In a similar case, the Court has held that a plaintiff waived her claim of a violation of procedural due process by failing to appeal her termination to state district court:

> First, Duprey received the requisite due process because she had notice and an opportunity to respond.  Second, she cannot properly challenge the fairness of the available post-deprivation procedure -- in this case, a petition for certiorari -- by making allegations that the proceedings through which she had already gone were biased.  Third, she waived the ability only to challenge the fairness of the available post-deprivation proceeding because she did not request such a proceeding.

Duprey v. Twelfth Jud. Dist. Ct., 2009 WL 2482170, at *18.

The Court concludes that McGrath waived his right to assert a procedural due process claim by failing to take advantage of the administrative and state court appeal process available to him.  McGrath's refusal to proceed through the administrative and state court appeals that were available to him precludes the Court from reviewing those procedures.  "A party cannot create a due process claim by ignoring established procedures."  Santana v. City of Tulsa, 359 F.3d 1241, 1244 (10th Cir. 2004)(holding that a district court properly entered summary judgment against a plaintiff's procedural due process claim where the plaintiff was given "adequate notice and an opportunity to meaningfully participate" in challenging the enforcement of a nuisance law, and the plaintiff did not initiate the administrative appeal available to him).

Similarly, here, the procedure available to McGrath gave him notice of his termination and an opportunity to present his side of the story.  See Lee v. Regents of Univ. of Cal., 221 F. App'x at 714 (holding that, even though a plaintiff asserted that the administrative review process "for employees subject to termination are so biased in favor" of the employee that a "fired employee should not be required to partake of them in order to raise a procedural due process claim," the plaintiff waived "any challenge to the fairness of the [employer's] post-termination hearing procedures because he never requested a post-termination hearing").

### 2. McGrath voluntarily relinquished his property interest in continued employment.

Additionally, the record establishes that McGrath voluntarily relinquished his property interest in his continued employment when he failed to report after he was reinstated.  In Garcia v. City of Albuquerque, 232 F.3d 750 (10th Cir. 2000), the Tenth Circuit held that the City of Albuquerque did not violate a bus driver's procedural due-process rights, because the bus driver, Silas Garcia, voluntarily resigned rather than accept reinstatement to a different position.  See 232 F.3d at 763-70.  The bus driver was terminated after failing a random drug test.  See 232 F.3d at 763.  The Personnel Board recommended reinstatement with treatment.  See 232 F.3d at 763.  The City of Albuquerque appealed the Personnel Board's ruling to New Mexico state court. While the appeal was pending, the City of Albuquerque reinstated Garcia.  See 232 F.3d at 763. "The City then informed Garcia that he was reassigned to a security guard position, but would still have the same rate of pay and hours as he had enjoyed as a bus driver."  232 F.3d at 764. Garcia did not report for work, despite two letters "warning him that his absence was 'unauthorized' and stating that he was jeopardizing his position with the City."  232 F.3d at 764.

Garcia brought a suit in the United States District Court of New Mexico, alleging, among other things, that the City of Albuquerque violated his procedural due-process and substantive due-process rights.

> Garcia first contend[ed] that the City did not afford him adequate procedural due process in that after he was reinstated by the Personnel Board, the City "without any hearing and without justification . . . refused to return him to work." Garcia base[d] this argument on the fact that the City's offer of reinstatement contemplated transferring him from his prior position as a bus driver to serving as a security guard.

232 F.3d at 769 (citations omitted). The Tenth Circuit rejected Garcia's argument. The Tenth Circuit held:

> Contrary to Garcia's assertions, we hold that his procedural due process rights have not been violated. The City argues that although it complied with the Personnel Board's order to reinstate Garcia, he resigned from his employment by refusing to report for work. We agree. As we ruled in Yearous v. Niobrara County Memorial Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997), where plaintiffs "resign[ ] of their own free will, even as a result of Defendant's actions, then they voluntarily relinquish[ ] their property interests and, thus, Defendant did not deprive them of property without due process of law." See also Parker v. Board of Regents of Tulsa Junior College, 981 F.2d 1159, 1162 (10th Cir. 1992). That is the case here. The City, in compliance with the Personnel Board's order, reinstated Garcia's employment, albeit to a different position with the same hours and rate of pay. Not satisfied with being transferred to a different position, however, Garcia repeatedly refused to report to work, ultimately leading the City to designate him as being "AWOL." Since Garcia clearly had the option of returning to work, we hold that his actions constitute a voluntary resignation. Parker, 981 F.2d at 1162 ("A resignation will be involuntary and coerced when the totality of the circumstances indicate the employee did not have the opportunity to make a free choice.").

232 F.3d at 770.

Under the Tenth Circuit's holding in Garcia v. City of Albuquerque, McGrath has voluntarily relinquished his property interest in continued employment. "The City, in compliance with the Personnel Board's order, reinstated [McGrath]," Garcia v. City of Albuquerque, 232 F.3d at 770, to his previous position. "[McGrath] . . . refused to report to

work, ultimately leading the City to designate him as" having abandoned his job.  Garcia v. City of Albuquerque, 232 F.3d at 770.  It follows that, "[s]ince [McGrath] clearly had the option of returning to work, [the Court] hold[s] that his actions constitute a voluntary resignation."  Garcia v. City of Albuquerque, 232 F.3d at 770.  Based on the undisputed facts in the record, the Court holds that McGrath "voluntarily relinquish[ed] [his] property interests and, thus, Defendant did not deprive [hi]m of property without due process of law."  Garcia v. City of Albuquerque, 232 F.3d at 770 (quoting Parker v. Bd. of Regents of Tulsa Junior College, 981 F.2d at 1162).  The Court, therefore, enters summary judgment in favor of the City Management Defendants on Count 1 of the Complaint.

### III.   COUNT 3 DOES NOT STATE A PLAUSIBLE FOURTH AMENDMENT UNLAWFUL SEARCH CLAIM AGAINST RIZZIERI, BERRY, AND PERRY, AND NO EVIDENCE SUPPORTS MCGRATH'S ALLEGATIONS.

The Court will grant the Motion as to Count 3 in favor of Rizzieri, Berry, and Perry. McGrath has failed to plead a plausible Fourth Amendment unlawful search claim, and no evidence supports his allegations.  Count 3 of the Complaint reads:

#### VIOLATION OF THE FOURTH AMENDMENT

54.    Each and every prior allegation is incorporate herein as if fully set out.

55.    The Fourth Amendment to the U.S. Constitution protects the rights of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

56.    The City's urinalysis drug test is a search subject to the Fourth Amendment to the United States Constitution, which requires a warrant based on probable cause except when reasonable suspicion or "special needs . . . make the warrant and probable cause requirement impracticable."

57.    The City's random drug testing may only be upheld as reasonable without a warrant or a showing of individualized suspicion if the government can make a threshold showing that "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."

58.     In this case, the City had no "special need" to require Michael McGrath to undergo invasive drug testing; nor was there any need to require drug testing upon his return to work or thereafter.  Defendants cannot even demonstrate an "ordinary need" for the City's current zero-tolerance drug-testing policy, which is both harsh and ineffective.

59.     Even if Defendants could show a "special need" for drug testing Michael McGrath without any warrant or suggestion of impairment, McGrath's interest in his employment and his right to privacy outweigh any interest or benefit that can currently be claimed by Defendant City officials.

Complaint ¶¶ 54-59, at 10-11.

The Complaint does not specifically state when or how many times the City of Albuquerque drug tested McGrath.  It mentions only that "[t]he City terminated [McGrath's] employment in 2008, after a positive drug test."  Complaint ¶ 1, at 1.  At that time, McGrath was working as a classified bus driver.  See Complaint ¶ 7, at 2.  Courts have upheld municipalities' suspicionless urinalysis tests of their bus drivers for illegal drugs.  See Freeman v. Middle Twp. Bd. of Educ., 529 F. App'x 213, 216 (3d Cir. 2013)("[W]e agree (for substantially the same reasons articulated by the District Court) that neither the alleged violations of protocol identified nor the testing procedure itself violated the Fourth Amendment."); Jackson v. Metro. Transit Auth., 53 F.3d 1280 (5th Cir. 1995)("The magistrate judge carefully balanced the interests and determined that Metro's testing was reasonable.").  Cf. Tanks v. Greater Cleveland Reg'l Transit Auth., 930 F.2d 475 (6th Cir. 1991)(upholding drug testing of municipal bus drivers after they are involved in accidents); Nat'l Treasury Emps. Union v. Yeutter, 918 F.3d 968, 977 (D.C. Cir. 1990)(upholding random suspicionless drug tests of motor vehicle operators for the United States Department of Agriculture).  "Courts have also upheld random drug testing for employees in the rail, highway, and water transportation industries; including railroad safety inspectors, highway and motor carrier safety specialists, and lock and dam operators."  Krieg v. Seybold, 481 F.3d

512, 518 (7th Cir. 2007).  The Court has similarly been unable to find a case prohibiting suspicionless drug testing of municipal bus drivers.

Accordingly, the Court concludes that suspicionless drug testing of municipal bus drivers does not violate the Fourth Amendment's prohibition against unlawful searches.  The City may not be able to administer suspicionless drug tests to all of its employees, but bus drivers play a unique role among municipal employees because they are entrusted with the lives of many other people on a day-to-day basis, which makes the requirement that they maintain their sobriety all the more important.  See Tanks v. Greater Cleveland Reg'l Transit Auth., 930 F.2d at 479 ("As a bus driver, Tanks was responsible for safely transporting passengers through the streets of Greater Cleveland.  A bus driver's duties are fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences."  (internal quotation marks omitted)).  Accordingly, if any municipal employees can be subject to suspicionless drug testing, it should be bus drivers.

Moreover, even if the Fourth Amendment prohibited such tests, the lack of case law directly on point from either the Tenth Circuit or the Supreme Court demonstrates that the law was not clearly established.  See A.M. ex rel. Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 3540161, at *53 (D.N.M. May 15, 2015)(Browning, J.)("Without a prior case on point to demonstrate clearly established law, the Tenth Circuit will not recognize any constitutional right as clearly established if a distinction from prior cases *might* make a constitutional difference."  (emphasis in original)(citation omitted)(brackets omitted)(internal quotation marks omitted)).  Accordingly, even if the random drug-testing policy violated the Fourth Amendment, qualified immunity would protect Berry, Perry, and Rizzieri from liability

for McGrath's Fourth Amendment unlawful search claim.  The Court will therefore grant summary judgment in favor of Berry, Perry, and Rizzieri on Count 3 of the Complaint.

## IV.   MCGRATH HAS NOT SHOWN THAT THE CITY OF ALBUQUERQUE HAD A POLICY OR CUSTOM THAT DIRECTLY CAUSED ITS EMPLOYEES TO VIOLATE MCGRATH'S CONSTITUTIONAL RIGHTS.

To establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  The only City of Albuquerque policy that McGrath has identified is its drug-testing policy.  As the Court has already concluded that the policy does not violate the Fourth Amendment's prohibition against unlawful searches, the Court finds that the City of Albuquerque is not subject to liability for McGrath's constitutional claims.

## V.   THE COURT WILL REMAND MCGRATH'S REMAINING STATE-LAW CLAIMS.

The Court will remand McGrath's remaining state-law claims to the Second Judicial District Court.  Congress has provided district courts with discretion to decline to exercise supplemental jurisdiction over state law claims in four situations:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Here, the Court has dismissed all of the McGrath's federal claims -- that is, all claims over which the Court has original jurisdiction.  See 28 U.S.C. § 1367(c)(3).  The Tenth Circuit has noted: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."  Koch v. Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998))(internal quotation marks omitted).  See Brooks v. Gaenzle, 614 F.3d 1213, 1229 (10th Cir. 2010)("[The Tenth Circuit has] generally held that 'if federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."  (quoting Bauchman v. W. High Sch., 132 F.3d 542, 549 (10th Cir. 1997)(alterations omitted)(internal quotation marks omitted)).  The Supreme Court has recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Am. v. Gibbs, 383 U.S. at 726.  This Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies.  See Armijo v. New Mexico, 2009 WL 3672828, at *4 ("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it."); James v. Chavez, 2011 WL 6013547, at *11.  Additionally, the Tenth Circuit has held that a district court does not commit an "abuse of discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction[.]'"  Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).  Given that the Court has dismissed all of McGrath's federal claims and

only state-law claims remain, the Court will remand McGrath's remaining state-law claims to the Second Judicial District.

**IT IS ORDERED** that the Opposed Motion to Dismiss, or, in the alternative, Motion for Summary Judgment by the City of Albuquerque, Richard J. Berry, Robbery Perry and Bruce Rizzieri and Memorandum in Support, filed June 18, 2014 (Doc. 17), is granted in part.  Plaintiff Michael McGrath's federal claims against Defendants City of Albuquerque, Richard J. Berry, Robbery Perry and Bruce Rizzieri are dismissed with prejudice.  McGrath's remaining state-law claims and case are remanded to the Second Judicial District Court, County of Bernalillo, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Paul Livingston
Placitas, New Mexico

 *Attorney for the Plaintiff*

Michael McGrath
Albuquerque, New Mexico

 *Plaintiff pro se*

Rebecca E. Wardlaw
 Managing Assistant City Attorney
Marie Legrand Miller
Melissa Marie Kountz
Samantha M. Hults
 Assistant City Attorneys
Albuquerque, New Mexico

--and--

Stephen G. French
Paula I. Forney
Erika E. Anderson
French & Associates, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendants City of Albuquerque, Richard Berry, Robert J. Perry, and Bruce Rizzieri*

Debra J. Moulton
Deborah D. Wells
Kennedy, Moulton & Wells, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant City Personnel Board*

Ada B. Priest
Una Campbell
Madison & Mroz, P.A.
Albuquerque, New Mexico

> *Attorneys for Defendant Paula Forney*